STOULIG, Judge.
Plaintiff, Robert V. Tamplain, was injured in a three-car collision on June 27, 1969, at the intersection of U.S. Highway 61 and Louisiana State Highway 53 near Reserve, Louisiana. A jury awarded him $33,187.35 against defendants Collinswood Poultry Company and its insurer, United States Fidelity and Guaranty Company. Of this amount, $30,000 was given for pain and suffering. The trial court rendered judgment in conformity with the verdict. In refusing to grant defendants a new trial, or alternatively, a remittitur, the trial judge stated he thought the quantum was excessive, but also expressed a reluctance to disturb the jury verdict. Defendants have appealed, seeking a reversal of that part of the judgment casting them for $30,000 damages for pain and suffering. Thus the only issue before us is whether the award was excessive.
*278 The record reflects that the plaintiff was taken to the hospital immediately after the accident. His injuries were diagnosed as a fracture of the second and third ribs on the anterior right side, a laceration of the lower lip requiring ten sutures and of the upper lip requiring two sutures, and a fracture of the right upper central incisor tooth. At that time he complained of pain in the right chest. His treating physician, Dr. Robert Albrecht, hospitalized the plaintiff for four days as a precautionary measure, explaining that fractured ribs often cause lung complications requiring immediate attention. However, lung problems never resulted.
After his discharge from the hospital, Mr. Tamplain was seen by Dr. Albrecht seven times on an outpatient basis between July 2 and August 11, 1969. On his last visit he was discharged from further treatment.
On August 29, 1969, plaintiff consulted Dr. Joseph Padua, a general practitioner to whom he was referred by his attorney. Despite thorough tests and examination, Dr. Padua made no objective findings in connection with plaintiff’s complaints. With respect to the injuries previously described, Dr. Padua diagnosed the complaints as “residual subjective symptoms,” indicating that plaintiff had recovered with no objective evidence of residual disability.
One of the injuries plaintiff alleged he sustained in the accident was a pain in the right elbow of which he first complained to Dr. Albrecht more than one month after the accident. On his first visit to Dr. Pa-dua he said he experienced pain in the right elbow but Dr. Padua could not determine the source. Plaintiff did not return to Dr. Padua until April 6, 1970, and his complaints still included the elbow pain. Again Dr. Padua’s findings were negative but he did refer plaintiff to an orthopedist for further evaluation. Plaintiff failed to consult the orthopedist as his doctor had advised.
It appears from the medical evidence that the fractured ribs and lacerated lips healed within two months after the accident and that the fractured incisor was capped in August, 1969. Plaintiff lost six weeks of work during his recuperation.
The existence of the elbow pain was never confirmed by any objective findings. The unexplained actions of Mr. Tamplain in not reporting this alleged pain to the treating physician until more than one month after the accident, coupled with his failure to consult an orthopedist when the pain allegedly persisted, makes suspect this subj ective complaint.
The complaint of prolonged and severe headaches forms the principal basis of plaintiff’s claim for damages. We find he has failed to adduce adequate proof of this condition to preponderate in favor of the conclusion that he actually experienced these headaches to the extent claimed and that they are causally connected to the accident.
Plaintiff testified: “I had headaches — • not just normal headaches — but they did bother me so much that at night I would have trouble sleeping.” At the time of the . trial nearly two years after the accident he told the court he was still experiencing severe headaches. He stated:
“ * * * [T]he headaches are as right from the beginning [when] I complained to Dr. Albrecht when I was in there about headaches. And they have —I have had trouble with the headaches from then all the way till this very moment. I’ve had headaches that occasionally get real severe from time to time. I may even [go] for a period of three or four days — where I get by without it. It sort of eases off, but it’s just about an every day affair.”
When asked if he had ever had one total month’s peace of mind from these headaches, plaintiff replied, “No never, maybe a day or two.”
*279 After he was discharged by Dr. Al-brecht, plaintiff claimed he was still experiencing the intense headaches and this is primarily why he consulted Dr. Padua. The medical evidence contradicts plaintiff’s testimony. We observe that Dr. Padua did not note plaintiff complained of headaches when he examined him on August 29, 1969. Considering the fact plaintiff stated he consulted Dr. Padua primarily because he could not get relief from the headaches, we find this omission strange and question whether plaintiff did in fact make such a complaint. According to Dr. Padua’s records, it was not until the April, 1970 visit that plaintiff complained of headaches. In June, 1970 plaintiff was hospitalized for two days to have tests run and X rays made to determine the source of the headaches. All tests were normal other than a shadow on the skill X ray that the radiologist thought could possibly be a granuloma tumor. Dr. Padua was not concerned about this and discharged plaintiff.
Finally, plaintiff consulted Dr. Homer Kirgis, a neurosurgeon affiliated with Ochsner Foundation Hospital, more than 18 months after the accident and more than eight months after completing the tests ordered by Dr. Padua. Dr. Kirgis testified the headaches could have resulted from a brain concussion caused by the accident. He explained that complaints of headaches generally subside within several months to one year after such a blow but he verified plaintiff could legitimately experience headaches for a longer period. X rays taken at Ochsner did not show the shadow on the skull that could have been a granuloma tumor.
Dr. Kirgis’ evaluation is necessarily based on the history related by plaintiff. What destroys the probative value of his testimony is that plaintiff gave the jury one set of facts and Dr. Kirgis, another. For comparison purposes we quote the neurosurgeon’s testimony about the history he received from plaintiff:
“Mr. Tamplain presented to me the chief complaint of having headaches. The history given with regard to this complaint was he was injured June 27, 1969, when involved in an automobile accident. At the time of the collision he believed that he struck his head against some part of the car and sustained lacerations of the lips. He believes he was probably rendered unconscious momentarily or at least stunned momentarily. He was taken to a local hospital from the scene of the accident where he was admitted and remained four days. He had experienced some degree of headaches from the time of the accident, but approximately two weeks after the accident, he began to experience rather severe headaches, headaches that continued although they became less frequent. They were described as usually beginning on top the head and as usually being more severe on the left than the right. At the onset of the severe headaches, they occurred daily but gradually became less frequent, and at the time of my examination occurred only about once a month. However, they were said to be quite severe and often caused him to go to bed. He stated in June, 1970, a brain wave test had been made and shortly thereafter a brain scan was performed.”
Plaintiff’s medical corroboration of his complaint of headaches rests on his credibility. Because he (1) testified to substantially different facts than those related to Dr. Kirgis, (2) did not include headaches as one of the “primary injuries” he suffered as a result of the accident in his petition filed on June 25, 1970, and (3) adduced confused testimony from Dr. Padua as to the complaints of head pain, we conclude that the frequency and severity of the headaches were exaggerated to increase the quantum. It follows that we are of the opinion that plaintiff failed to establish by a preponderance of credible evidence that he did in fact exeprience the pain and suffering to the extent he claimed.
*280 Accordingly, we think the quantum for pain and suffering should be reduced from $30,000 to $6,S00. In fixing this amount we are mindful of the Supreme Court decisions admonishing appellate courts, in adjusting quantum, to adhere to LSA-C.C. art. 1934(3), which states in part:
“In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury * *
See Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) ; Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964) ; and Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).
In Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971), the Supreme Court stated that two principles of appellate review of quantum emerge from these cases: modification of a trial court judgment on general damages is limited to instances where the judge or jury has abused the “much discretion” conferred by the Civil Code, and the awards in other cases may simply be used as aids to determine whether there has been an abuse of discretion at the district court level.
With the pain and suffering associated with plaintiff’s headaches discounted, it is apparent that the damages awarded constitute an abuse of discretion. The following cases were considered in arriving at this conclusion. Domingeaux v. Davis, 250 So.2d 432 (La.App. 3d Cir. 1971), awarded $1,750 for severe facial bruises with a possible fractured cheekbone, contusions to the left shoulder, back muscles, left knee and thigh, and lacerations of the left hand and right elbow — all of which prevented plaintiff from reporting for work for five weeks. In Falgout v. Falgout, 251 So.2d 427 (La.App. 1st Cir. 1971), $2,500 was allowed to a lady who suffered two broken ribs, multiple bruises over her body and a cut eyelid that drooped and was surgically corrected. A judgment of $2,400 was rendered in favor of the plaintiff who lost three weeks’ work due to “severe trauma and bruises” in Acrey v. Cotton Brothers Baking Company, 255 So.2d 429 (La.App. 3d Cir. 1971). Cole v. Maryland Casualty Company, 205 So.2d 863 (La.App. 3d Cir. 1968), resulted in an award of $3,000 to a lady for a loose tooth, a neck injury, serious headaches causing occasional nausea and vomiting, and a cut lip. Finally, in Moore v. Holden, 254 So.2d 147 (La.App. 3d Cir. 1971), an award of $2,798.88 was affirmed for injuries including a laceration above the left ear, severe cervical strain, and contusion of the chest muscles, causing five weeks’ loss of work, seven months of medical treatments, and headaches for 21 months.
For these reasons the judgment awarding $30,000 for pain and suffering is amended to reduce these intangible elements of damage to $6,500. In all other respects the judgment of the trial court is affirmed. Plaintiff is to pay the cost of this appeal.
Amended and affirmed.