LEMMON, Judge.
The only issue in this case is whether the evidence supports the $50,000.00 jury award to Mr. and Mrs. Otha Lea for damages resulting from Mrs. Lea’s injuries sustained in a rear end automobile collision.
In the August 21, 1970 accident Mrs. Lea sustained injuries to her neck, chest and forehead. Unable to contact the family doctor, who was on vacation, Lea took his wife to a hospital emergency room, where she was examined, given medication and released.
Mrs. Lea, then employed as a meat wrapper in a supermarket, missed work the next three days, but thereafter returned to her job on a regular basis.
*904 On September 2, 1970 Mrs. Lea consulted Dr. Floyd Hindelang, her longtime family doctor, complaining of persistent headaches, front and rear neck pain, a pulling or burning sensation in the chest, dizziness, nervousness and irritability. The doctor prescribed medication and heat treatments. When Mrs. Lea returned two weeks later with the same complaints, plus left shoulder and arm pain, the doctor continued her on medication and prescribed ultrasonic treatments to the back of the left shoulder. Mrs. Lea received seven treatments from September 23 to October 12, 1970. After an October 23 visit with the same complaints, Mrs. Lea did not seek further medical attention during the next three months.[1]
On February 1, 1971 Mrs. Lea again consulted the doctor with the same complaints. She also expressed concern about the burning sensation in her chest, inasmuch as she had contracted tuberculosis in 1946 (which was subsequently arrested) and had previously experienced a collapsed lung. X-rays revealed no active pathology.
On May 10, 1971 Mrs. Lea reported continued pain in the neck, as well as numbness and pain in the right upper arm (as opposed to previous complaints on the left side). The doctoi ordered X-rays, which were reported as negative, and recommended an orthopedic consultation.
On June 17, 1971 Mrs. Lea consulted Dr. Blaise Salatich, an orthopedic surgeon. He recorded that the 140-pound, 50-year old Mrs. Lea exhibited moderate tenderness over the right suboccipital area, Lhe posterior and lateral cervical spine bilaterally, and the mid and lower cervical articulation. He also found palpable spasm in the muscles in the back and side of her neck; limitation of motion of the head and neck in all directions and upon flexion and hyperextension; a moderate degree of hy-peresthesia of the skin over the back and right side of the neck and shoulder; and deep soreness of the right forearm elicited by tapping with a rubber mallet. He recorded as positive a “nerve root stretch test,” which he applied by pushing the patient’s head toward the shoulder as far as the head would go.
Dr. Joe Hopkins, a radiologist, performed X-rays at Dr. Salatich’s request and reported asymmetry between the relationship of the adontoid process and the lateral masses, wider on the left; flattening of the posterior lordotic curve; limitation of flexion; and posterior subluxation or slippage of several cervical vertebra. He and Dr. Salatich stated that the sublux-ation indirectly indicated ligamentous instability and that the other abnormalities were consistent with muscle spasm.
Dr. Salatich diagnosed “a whiplash type neck injury involving periarticular capsular ligamentous and musculofascia cervical vertebra,” with “possible right stretched type cervical nerve root injury,” and a contusion of the anterior chest. He advised her to restrict her physical activities, prescribed muscle relaxants, pain medication and ointment, and instructed her to report to his physiotherapist daily for treatment.
After three weeks on this regimen with no improvement, he fitted her with a cervical collar and advised her to wear it day and night continuously. The collar provided some relief, especially of the headaches.
Thereafter, Dr. Salatich continued her on the same regimen, recording “generally the same subjective and objective sympto-mology,” almost every time she visited his office periodically over the next 18 months.
In October, 1971 Mrs. Lea stated she had become dizzy and almost blacked out.” Dr. Salatich referred her back to her fami *905 ly doctor, who performed blood tests and reported the results as normal.
In March, 1972 Mrs. Lea stated that she had lost 28 pounds in three months, that her “bad spells” were of longer duration, and that the dizziness was occurring more frequently. Dr. Salatich again referred her to the family physician, primarily for the weight loss problem. However, Dr. Sala-tich attributed the dizziness to restriction of blood flow to the brain caused by spasm of the cervical muscles. He also performed a complete orthopedic workup at that time, including X-rays, and reported substantially the same results.[2] He did not, however, change the previous course of treatment.
In June, 1972 Dr. Salatich urged Mrs. Lea to quit working as a meat wrapper. He was under the impression that she worked constantly in a cooler, using her hands and arms in an extended position in front of her.[3] Mrs. Lea had worked at the supermarket for 14 years. She stated she had continued working in pain after the accident because of economic necessity, her husband being able to work only part time because of physical disability.
Mrs. Lea was in another automobile accident on July 25, 1972, but she and Dr. Salatich stated there was no aggravation of her previous condition.
Mrs. Lea took a leave of absence from her employment on August 24, 1972. She testified that the manager had sent her to the hospital on that day for treatment for a splinter in her finger, but offered no further explanation as to the leave of absence. At the time of trial in January, 1973 she had not returned to that job nor engaged in any other employment.
Dr. Salatich testified that Mrs. Lea’s physical condition responded favorably when she left her employment. However, she stated that she had improved “slightly” and had begun to gradually gain weight.
In October, 1972 Mrs. Lea consulted her family physician, complaining of constant pain in the abdomen for a three-week period. Testing of the intestinal area revealed no disorder.
In January, 1973, just prior to trial, Dr. Salatich performed another complete workup. He reported essentially the same findings and opined that her condition was permanent. He stated he would continue the same treatment (21 visits in the last four months), slowly trying to remove her from the collar. He offered no other suggestions or proposals, nor did he recommend neurosurgical consultation, although he himself had suffered from a nerve root injury and had consulted a neurosurgeon for relief of his sufferings.[4]
Dr. Salatich described Mrs. Lea as “unemployable,” referring to problems with *906 pre-employment physical examination.[5] He advised against her returning to her former employment, particularly emphasizing- her exposure to the cool temperatures and constant use of extended hands and arms. At no time did he suggest, however, that she seek other work in the supermarket away from these aggravating factors (she had worked in other positions), and he did not state that her physical condition would prevent her from performing other reasonable employment duties with the same or another employer.
Mrs. Lea’s husband, her daughter, her neighbor and the meat department assistant manager at the supermarket confirmed that after the accident she became nervous, irritable and impatient; she began to drop things when using her right hand; she began taking pills frequently; and she had not behaved similarly before the accident, when she had enjoyed good health. In general they described her as a different person after the accident. They also observed that her weight dropped from 140 pounds to 104.
Additional medical testimony was presented by Dr. Eugene Dabazies, an orthopedic surgeon who performed the court-ordered examination in Alarch, 1972. He found no spasm or atrophy, but did elicit tenderness of the right sternocleido-mastoid paraspinal and trapezius musculature. He also noted slight hyperesthesia of the neck, shoulder, forearm and hand. He found that the motor function of the peripheral nerves was intact and that the testing of the deep tendon reflexes did not indicate nerve root injury. Furthermore, he did not observe any abnormalities in the X-rays.
Dr. Dabazies diagnosed a cervical strain, which he characterized as a classical hy-perextension injury to the musculature and ligamentous structure of the cervical spine without damage to the intervertebral discs or the peripheral nerves. He recommended discontinuance of use of the collar and gradual return to normal work and family activities. He did not anticipate there would be any residual disability.
As normal treatment for this type of injury from the beginning, Dr. Dabazies testified he utilized (depending on severity) restriction of activity or bed rest; muscle relaxants, analgesics and heat; intermittent traction at home; and occasional physiotherapy in the form of moist heat and massage. He further stated that if the condition does not resolve in six months, he would feel obligated to find out why and would use hospitalization with traction, and would perform electromyographic studies and myelograms in order to determine the course of further treatment.
The following medical bills were reasonably proved:
Hospital emergency room $ 18.00
Hospital X-rays 35.00
Dr. Hindelang 87.00
Dr. Hopkins 105.00
. Cervical collar 23.85
Dr. Salatich 800.00
Aledicine 572.97
We have recited the medical evidence in unusual detail, because we believe the jury abused its much discretion in awarding $50,000.00 on the evidence presented. The medical evidence supports a finding that Mrs. Lea sustained an injury to the mus- *907 cíes and ligaments of the cervical spine, with probable ligamentous stretching or tearing and scar tissue formation attendant to the healing process, which to some extent accounts for the limitation of motion. The record, however, does not support a finding that Mrs. Lea sustained a herniated disc or substantial nerve root injury, or that the injury which she did sustain substantially impaired her earning capacity. Under our evaluation and analysis of the record, and particularly of the medical evidence, the damages proved bear no relationship to the amount of the jury award.
The evidence is simply insufficient to bridge the gap between a cervical strain, with prolonged symptoms compounded by the burden of employment duties necessitated by economic conditions, and a disc or nerve root injury, with permanent and substantial impairment of earning capacity. Plaintiffs’ proof of damages caused by the accident falls short of that necessary to support an award in the range of the jury verdict. We therefore set aside the jury verdict and fix an award based on the evidence.
Mrs. Lea did suffer a pain-producing injury and worked in pain because of economic necessity. She received sporadic treatment for ten months and consistent but unproductive treatment for the next 19 months. At the time of trial (2% years after the accident) some residual symptoms remained, which were not reasonably expected to be permanent.
We award the sum of $22,500.00 as general damages, $1,641.82 as medical expenses, and $48.00 for loss of earnings (two days immediately after the accident).
For these reasons, the judgment of the trial court is amended to decrease the total amount of damages to $24,189.82. As amended, the judgemnt is affirmed.
Amended and affirmed.

. Mr. ami Mrs. Lea testified the doctor was out of liis office during this period with personal medical problems. The doctor confirmed a two-week absence during this period, but stated his calls from patients were referred to another physician.

. The trial was originally scheduled at the end of March.
Defendants’ requests for a physical examination had been denied, and the court in early March ordered an examination on defendants’ contradictory motion.

. Her former job supervisor described her duties as weighing and wrapping meat in a meat room at a 42° temperature, placing the meat on trays, wheeling the tray on a cart from the meat room to the display cases in the market, and removing the meat from the trays to the display cases. She was sometimes required to handle relatively heavy objects, such as turkeys.

.Dr. Salatich stated:
“If Mrs. Lea wanted to consult another doctor, she could have. She would have had my blessing. Number two, as I said before, when —I would have sent her to any other type of specialist. And if he finds nothing, let’s say when he knows lie’s got something, she can’t shake him medically, legally, unless it was in Mississippi and then she’d have the right then.”

. He reasoned:
"If Mrs. Lea would go to someone who would ask no question as to her background, as to injuries, as to anything, she may get by for a while, but. if she has to pass what is known as a pre-employment interrogation, which means questioning of your background, where you’ve worked, sickness, illness, injuries and she gave them the details of all of this, she wouldn’t get past the front door. Let’s say she wouldn’t get past my front door if I was evaluating her.”