330 So.2d 649 (1975)
Gary James COCO, Plaintiff-Appellee,
v.
WINSTON INDUSTRIES, INC., et al., Defendants-Appellants.
No. 5186.
Court of Appeal of Louisiana, Third Circuit.
December 24, 1975.
On Rehearing March 10, 1976.
Dissenting Opinion March 17, 1976.
Rehearing Denied April 7, 1976.
Writ Granted June 9, 1976.
*652 Sessions, Fishman, Rosenson, Snellings & Boisfontaine by Breard Snellings, New Orleans, Watson, Murchison, Crews & Arthur by William P. Crews, Jr., Natchitoches, for defendant-appellant.
G. F. Thomas, Jr., Natchitoches, Cook, Clark, Egan, Yancey & King, by Sidney E. Cook, Shreveport, for plaintiff-appellee.
Before CULPEPPER, DOMENGEAUX and PAVY, JJ.
PAVY, Judge.
Plaintiff brought this tort action for injuries sustained when a dado saw severed four of his fingers and a portion of his hand. At the time of the accident, plaintiff was employed by Sherwood Homes, Inc., (herein called "Sherwood"), a corporation wholly owned and dominated by Winston Industries, Inc., (herein called "Winston"). Both corporations were engaged in the business of manufacturing and selling mobile homes. Sherwood owned and operated one of the several regional plants in Winston's system.
The saw in question had been designed and installed at the Sherwood plant by an employee of Winston. Universal Underwriters Insurance Company (herein called "Universal") had liability insurance on Winston and the executive officers of both Sherwood and Winston. Plaintiff sued Winston on the theory that it had designed and installed a negligently hazardous saw. It sued Universal on the theory that it insured executive officers of both Winston (whose executive officers were involved in the alleged negligent designing and installation of the saw) and Sherwood (whose executive officers were allegedly negligent in using and maintaining the defective saw and in putting plaintiff to work on it without proper training in its use and warning of its dangers).
The case was tried by a jury which returned a $350,000 verdict for plaintiff and against ".......all defendants". On this verdict, judgment was rendered against Winston Industries, Inc. and Universal Underwriters and they have appealed.
Appellants complain that certain procedural errors warrant reversal or remand. Those dealing with evidentiary problems will be dealt with in connection with treatment of the substantive issues to which they relate.
Winston argues that it has not been effectively cast by the jury. It argues that it was not expressly named in the verdict, that the case caption on the verdict sheet named as defendants, Universal Underwriters, Inc. and Sherwood Homes, Inc., and accordingly the verdict cannot be construed to include it as a party liable. We have decided that Winston Industries, Inc. has a good exclusive remedy defense and it will be released from liability so that the issue concerning the verdict is academic and we will bypass it.
*653 Appellants further claim that the jury was not sufficiently charged for a general verdict and that they should have been given special interrogatories or guided more in the instructions. No specification is made in what respects the charges are deficient. We have examined the charge and think it sufficiently charges the jury. A judge need not give interrogatories except where he deems them necessary in the particular case. This is a matter mostly within his discretion. We are not inclined to interfere with it in this case.
Universal contends that the jury charges misled the jury into believing that the insurer was liable for negligence of anyone in the employ of Winston or Sherwood. In one part of the charge the jury was instructed that the insurer admitted coverage ". . . . .if one or more of the named individuals are guilty of negligence. . . . . ." The judge did not designate the individuals to whom he referred. Later in the charge, the following instruction was given to wit:
"Therefore, the first question for you to determine is whether or not any of the named executive officers, agents and employees or insured was within the above criteria guilty of negligence, in any of the respects claimed by plaintiff which was the proximate cause of plaintiff's accidental injury."
Universal contends that under the above language, the jury could have cast it because of the negligence of any employee and that there was evidence tending to show negligence of employees who were obviously not executive officers. We think the factual basis of appellant's claim is sound but the procedural effect for which it contends is not proper under the circumstances.
It is true that there was much evidence tending to show negligence on part of simple employees. But there is also evidence of negligence by executive officers, and we might as well decide the matter here and now. A remand for new trial where inflammatory evidence may have prejudiced the jury or where there was exclusion of evidence crucial to a close issue are entirely different from this situation. The case has been thoroughly tried. A remand because of improper jury instructions would only result in a retrial on substantially the same evidence with different jury instructions. On the evidence in the record, we do not think there is any serious question but that there was negligence on the part of executive officers. Even if a jury in this case had held otherwise we would probably have to reverse such a jury verdict despite the restrictions under the "manifest error" jurisprudence.
In Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (1969), a leading case on the question of remand because of erroneous instructions, the court specifically reserved to the appellate forums the right to decide in each particular case whether a remand would serve the interests of justice. It stated:
"While we adhere to the principle that every error in instructing a jury does not require a remand, we are convinced that the instructions to the jury in this case were so erroneous that there was not proper judicial determination of the issues presented to it, and law and justice require us to remand."
We are convinced that the ends of justice would be best served by deciding the case on the record as presented to us rather than a remand for a new trial, entailing substantial delays and a reconsideration of the issue of negligence of executive officers on substantially the same record.

WINSTON'S EXCLUSIVE REMEDY DEFENSE
Winston contends plaintiff has no claim against it because his exclusive remedy is in workmen's compensation under the provisions of Louisiana Revised Statutes 23:1032 because by Section 6 of the Workmen's *654 Compensation Act (La.R.S. 23:1061), it is the statutory employee of plaintiff. That latter provision provides that a principal contracting out a portion of its business liable to an employee of the contractor as "... if the employee had been immediately employed by. ..." the principal. We think the contention is correct.
There is no dispute but that the trade, business and occupation of Winston was the manufacture and sale of mobile homes and that it performed this trade through a number of separate corporations or operating divisions, one of which was Sherwood, wholly owned and controlled by Winston. As a matter of fact, Sherwood had no actual existence other than as an operating division of Winston Industries, Inc. and was its alter ego.
Winston Industries, Inc. was originally named Winston Mobile Homes, Inc. and was incorporated in Alabama. This corporation was completely run by Mr. Don Tidwell in whom all the directors and stockholders had complete confidence and to whom they delegated all authority. It did conform to legal requirements so as to maintain some corporate status.
The same individuals who formed that corporation formed several smaller corporations at strategic places throughout the south. One of these was Sherwood Homes, Inc. formed in Louisiana and which operated the Natchitoches plant at which plaintiff was injured. All the stock in Sherwood was originally owned by individuals but shortly thereafter transferred to Winston Industries, Inc. After the original directors' meeting, very little of the corporation amenities were maintained. Winston Industries, Inc. and the various other subsidiary corporations, including Sherwood, were run as a one-man company by Mr. Tidwell. Some of the personnel at the Sherwood's Natchitoches plant were actually paid with Winston Industries' checks. The checks by which plaintiff was paid indicated that the drawer was: "Sherwood Homes Division of Winston Industries, Inc."
Winston Industries, Inc. had no trade, business or occupation other than that of manufacture and sale of mobile homes. Sherwood Homes, Inc. had no trade, business or occupation other than that of manufacture and sale of mobile homes. Winston Industries, Inc. controlled and owned Sherwood Homes, Inc.
In Brown v. Benton Creosoting Co., 147 So.2d 89 (La.App., 2nd Cir. 1962), a creosoting company had a corporate existence but was totally controlled by Kennedy Sawmills, Inc., which effectively dominated a number of smaller entities including the creosoting corporation. Brown, an employee of the creosoting corporation, sought to recover workmen's compensation benefits against Kennedy Sawmills, Inc. The court held for recovery stating:
"The conclusion is, therefore, inescapable that Kennedy Sawmills, Inc., is the mere alter ego of Benton Creosoting Co., Inc. Keller v. Haas, 202 La. 486, 12 So.2d 238; Lindstrom v. Sauer, La.App. Orleans, 1936, 166 So. 636; Mayo v. Pioneer Bank & Trust Company, U.S.C.A. 5th Cir., La., 1960, 274 F.2d 320. The effect of the arrangement was to place Kennedy Sawmills, Inc., in possession as owner and operator of the business purportedly conducted under the name of Benton Creosoting, Co., Inc. The result was that the business conducted was that of Kennedy Sawmills, Inc., over which it had full management and entire control. Under such circumstances, Kennedy Sawmills, Inc., is not permitted to cloak itself behind the corporate entity of Benton Creosoting Co., Inc., to shield itself from responsibility. Kennedy Sawmills, Inc., is, therefore, bound to the same extent that Benton Creosoting Co., Inc., itself is bound."
If plaintiff herein had been asserting workmen's compensation benefits *655 against Winston, recovery would have been granted. The compensation statute should be liberally construed to provide coverage benefits whenever possible. This is true where the coverage is asserted by the employee to obtain benefits or by the employer as a defense in a tort action brought by the employee. Cole v. Chevron Chemical Company-Oronite Division, 477 F.2d 361 (5th Cir. 1973); Liles v. Riblet Products of La., Inc., 363 F.Supp. 358 (W.D.La. 1973); Fabre v. Travelers Ins. Co., 286 So.2d 459 (La.App. 1st Cir. 1973), writ denied La., 288 So.2d 646; Broussard v. Heebe's Bakery, Inc., La.App., 254 So.2d 284; Beard v. Wilson Wholesale Distributors, Inc., 215 So.2d 664 (La.App., 1st Cir. 1968).
Plaintiff claims the statutory employer defense is not applicable because the trade, business or occupation of Winston did not include the manufacture of dado saws or similar equipment. This is true but it does not affect the question now at hand. Plaintiff was not engaged in manufacturing or installing dado saws when injured. He was operating a dado saw. The test is whether the claimant, at the time of injury, was pursing the trade, business or occupation of the person sought to be held in tort. It is not whether the negligence causing the plaintiff's injuries arose out of the trade, business or occupation of the defendant.
Plaintiff cites Duplechin v. Pittsburg Plate Glass Co., 265 So.2d 787 (La.App. 3rd Cir.1972); and Moak v. Link-Belt Co., 229 So.2d 395 (La.App. 4th Cir.1969). One of these involved the addition of a complete new facility and the other a redoing of a major portion of an existing facility. The claimants were hurt while working in that construction. Recovery was allowed because the defendants in the tort claims were plate glass manufacturers or sugar refiners and did not generally engage in construction. In this case, plaintiff was injured while operating the saw to notch supports for the mobile home floor. He was then engaged in the business, trade or occupation of Winston. The fact that the negligence may have arisen from the design or installation of the saw is not the test. If plaintiff had been injured while making or installing the saw then the facts of the Duplechin and Moak case would have been similar and the rules therein applicable here.

DESCRIPTION OF SAW APPARATUS
The dado (notching) saw is actually a set of seventeen circular blades (9 inches in diameter) contiguously set on an automated shaft or axle which is horizontally positioned. There are two outside or trimming blades and fifteen inside or chipping blades. The combined width of the blades is 3½ inches. The saw and the board to be notched are so positioned that the saw cuts into the board 3/4 inch. Thus notches 3/4 inch deep by 3½ inches wide are made.
The saw is used in connection with a table or platform about 14 inches wide and 3 to 4 feet long. The saw rests below and to the rear of the table. There is a notch or opening, apparently slighly larger than the notch to be cut, at the rear of the table. The 2 by 6 board which is to be cut is laid flat on the table with its edges flush with the rear of the table. The saw is then elevated and passes through the opening in the table and cuts into the board as it rises.
The blades are powered by a source separate from that which lifts the saw. This power to the blades is on continuously except for breaks, during lunchtime and possibly when the operator obtains a supply of boards from a nearby stack.
The raising of the saw is effected by a pneumatic pump which is underneath the saw. This lifting device is controlled by a foot pedal which is under the table, recessed from the front of the table and elevated somewhat from the floor. Pressing the pedal raises the saw up through the table opening and into the board to be notched. Release of the pedal deactivates the pneumatic force and the saw descends *656 to its below-the-table position by its own weight. The length of time necessary for the saw to go through the cycle of rising and descending, when the pedal is immediately released after being pressed, was estimated to be between ½ to 2 seconds.
Along the rear of the table (except for where the saw comes up) is a metal straightedge or backstop. The 2 by 6 board is held steady by two devices known as airdogs. These are made up of an air cylinder, a plunger emanating from the air cylinder and a clamp or gripping device at the other end of the plunger. There are two of these devices. They are at the front of the table and on either end of it. These devices are so angled that when the pneumatic force is applied the plunger pushes the grips or clamps against the board in a downward and rearward direction and steadies it against the table and backstop so that it resists the force of the saw as it cuts into the board. These airdogs are controlled by a switch about 2 feet above the table.
To make a notch, the operator will first position the 2 by 6 boards so that the notch will be made at the desired point lengthwise in the board. The positioning is done with the hands and the board is moved from the operator's right to his left. At the rear of the table and to the operator's left is an indicator which determines the position of the board for notching at the correct point. Second, the operator will activate the airdogs which will jam the board into the corner formed by the table and the backstop. Third, the operator presses the foot pedal activating the elevating pump, and the saw is forced upward through the table opening and cuts its way through the 2 by 6 and then descends back under the table.
There is much controversy in the case as to whether the saw was housed or encased while below the table. We consider this question irrelevant to the case. There is no dispute that above the table there were no guards, shields or other protective devices around the saw and it was completely exposed. When the saw is completely elevated, over half of it is above the table top. It turns at 3,600 revolutions per minute.
The operator of the saw is responsible for other steps in the assembly line. After obtaining the boards from a nearby stack, he places them on a conveyor table with handrollers. This table is at the extreme right of this portion of the assembly line. He then moves the boards leftward to a radial arm saw with which he squares the ends and cuts them to the precise length. Then he moves them to a gang nail press. This is a device to splice two of these 2 by 6 boards together at the ends by means of two brackets with prongs. A bracket is placed underneath and above the two boards to be spliced, and the press forces the prongs into the boards and secures the brackets. From the gang nail press, the boards are again moved leftward and onto the table with the saw. After the notching the boards are again moved leftward to another conveyor table with rollers.
From defendants' sketch, it is noted that there are conveyor tables with nonautomated rollers at either end of this portion of the assembly line. From the beginning of the radial arm saw unit to the leftmost edge of the dado saw table, there are no rollers. Accordingly, the timbers are moved across the saw table by manhandling except for such assistance as is had from the rollers on the conveyor table leading away from the saw table. The splicing is done prior to the notching so that the saw operator is usually handling from two to five 2 by 6 boards at least 12 feet long.
These 2 by 6 boards are spliced together in 12-foot lengths to form 60-foot stringers which are used as joists or supports for the trailer home floor. Cross pieces are fitted into the notches, and the plywood for the flooring nailed onto the cross pieces. Usually the notches are 2 feet apart so that a 60-foot stringer contains 29 *657 dadoes or notches. There are five stringers per mobile home and the plant usually produced four to five mobile homes per day. With an average of four and a half mobile homes per day, the computation (4.5 × 5 × 29) would be 652 notches per day or 81 notches per hour in an 8-hour day.

NEGLIGENCE IN DESIGN AND CONSTRUCTION OF SAW APPARATUS
Plaintiff contends the saw apparatus was hazardous to an actionable degree in that the blades were unguarded and that is was possible for the operator to accidentally trip the elevating control when his hands were at or near the blades as they ascended.
Defendants' contention in this regard is that it was impossible to effectively guard the saw without impairing its function and that guarding was not necessary because the operator could elevate the saw while his hands were away from the blades.
One of plaintiff's experts was Dwayne Gilbert, a professor of industrial education at Northwestern State University. He actually inspected the saw in operation shortly after the accident. He thought the saw was not safe because of the lack of guarding the possibility of activating the saw while the operator's hands were near the path of the saw. He stated that the foot pedal was too near the normal body movements and subject to accidental tripping. He recommended a switch requiring the use of both hands to activate the saw.
Dr. Joseph Barnwell, a professor of mechanical engineering for many years at Louisiana Tech and holder of degrees in electrical and mechanical engineering, was also an expert witness. He had taught machine designing, including safety aspects of it, and had designed automated equipment for major concerns including guards or industrial devices. He stated that two basic principles of safety in industrial machinery was that any moving part which could come in contact with the body should be guarded to the fullest extent possible and that the design should necessitate that an operator's hands be away from the moving part to activate it.
By means of superimposing cardboard pieces on a sketch of the saw assembly, he demonstrated to the jury a protective shield or guard that could have been used in this instance. It consisted of a type of metal housing around the area where the saw elevates with a cavity of sufficient size to receive the 2 by 6 to be notched. This cavity would have a floating guard on it with a beveled effect so that when the 2 by 6 would be pushed into the cavity, the guard would lift and permit positioning of the board. He stated that this was a common type of guarding in the industry and considered no practical problem would be involved.
He also stated that the foot pedal should have been guarded above and on its side to prevent accidental tripping.
Defendant presented Don Frydenberg as an expert in the field of design and safety of saws. He was design and engineering manager for the Clary Corporation, a manufacturer of automated equipment for the homebuilding industry. He never saw the assembly in question and had prepared a sketch of it from discussions with Leo Johnson, plaintiff's lead man or immediate boss, and Harold Bridges, who had designed and installed the saw. He did not consider the saw dangerous because, the foot pedal being recessed 14 to 16 inches from the front of the table, activating it unintentionally would require an unnatural movement out of the workman's path and because the hands could be completely away from the saw at this time. He determined the pedal to be 6-7 inches above the floor and did not think a guard over the pedal was necessary because of its out-ofthe-way location. He considered the saw in question safer than many other dado saws he had seen including radial arm saws which require the operator to hold *658 the stock to be cut and draw the saw towards the operator. He claimed the saw could not be effectively guarded because of the necessity for an opening to position the stock to be cut. This would allow the hand to enter the area of the blades. He did not think the guard proposed by plaintiff's expert would work because, upon shoving the board into position, the bevel would not push the floating guard up and there would be a cocking or jamming effect.
He acknowledged familiarity with the safety design principle which requires that an operator on a production line be required to use both hands at a point away from the moving parts to activate any moving parts and thought such a design in this case was unnecessary but not objectionable. This witness pointed to a saw apparatus designed by his company without guards but it was brought out that this machine had a conveyor that fed the lumber to the saw and the operator never had to place his hands anywhere near the saw. He acknowledged that the bible in industrial safety was the publication of the National Safety Council entitled "Accident Prevention Manual for Industrial Operation" and that he was familiar with it. He agreed with the following propositions enunciated in that publication to wit: "Design the machine so that it is impossible for the operator to get at the point of operation or any other hazard point while the machine is operating; locate machine controls so that the operators will not be in the vicinity of the point of operation while actuating the controls; design a mechanical device, not a manual device, for loading, unloading and operating the machine; design a mechanical feed, not a manual feed; provide failsafe interlocks so that the machine cannot be started when it is being loaded or being unloaded or being worked on."
It is noted that Prof. Barnwell stated that the protective device was in common use and would present no practical problem. Defendants' expert contended otherwise. We could not say for certain that the device would be practical but are inclined to believe Prof. Barnwell. He was much more candid, detached and impressive than the other witness. His device was almost a 100 per cent shield and somewhat sophisticated. There is no doubt in our minds that a generally effective guard could have been devised to protect against the type of accident which befell plaintiff. A three-sided metal housing (the fourth side being open to the rear of the table) elevated from the tabletop slightly over 2 inches to allow positioning of the stock and with the housing having such dimensions that the whole hand and a portion of the arm would have to slide under the housing before even the fingertips would reach the blade, would have prevented this accident. This would have prevented even a deliberate pushing of the hand and arm under the housing. However, it is not such deliberate action that was to be prevented but the accidental placing of the hand in the path of the blades. These accidental movements are usually jerky and angled into the saw. Such a housing with only a 2-inch opening immediately above the tabletop would have prevented plaintiff's hand from reaching the blades of the saw.
Pictures were admitted into evidence showing a crude boxlike guarding device constructed for this saw after the accident. Defendants objected to this under the rule that postaccident corrective measures are not admissible to show negligence. The pictures were presented to the jury with the explanation that they portrayed another saw apparatus similar to the one in question. Plaintiff stated that its purpose in offering these was not to show negligence directly but to show the feasibility of guarding the machine as to which there was a sharp issue. Some authorities allow the evidence when offered for a purpose other than to directly prove negligence even though this also tends to negate the purpose of the rule which is to encourage safety by postaccident corrections. *659 See McCormick, Hornbook on Evidence, 2nd Ed., page 66, Sec. 275 and Federal Rules of Evidence No. 74. Louisiana generally excludes this type of evidence. See Givens v. DeSoto, 156 La. 377, 100 So. 534 (1924); Galloway v. Employers Mutual, 286 So.2d 676 (La.App. 4th Cir. 1973); Callahan v. Town of Bunkie, 287 So.2d 629 (La.App., 3rd Cir. 1973); Landry v. Adam, 282 So.2d 590 (La.App. 4th Cir. 1973); and Pitre v. Employers Liability Insurance Co., 234 So.2d 847 (La.App., 1st Cir. 1970). However, these cases do not generally deal with the question of admissibility under the exceptions discussed in McCormick and actually enacted by the new federal rules of evidence.
Even if the evidence was not admissible for the restricted purpose, the result would have been the same. The other evidence makes inescapable the conclusion that the saw could have been guarded. Nor should the case be remanded because the jury considered inadmissible evidence. The pictures were presented to the jury as portraying another saw similar to the one in question. The trial judge went to extremes to strike a balance between the competing claims of the litigants on this issue and eventually forbade plaintiff from continuing to use the pictures after he had made his point regarding the feasibility of constructing a protective device.
If the saw could not have been guarded, it was all the more reason that the design of the assembly necessitate the operator's hands being away from the saw when the elevating mechanism was activated or, at least, that it be impossible to accidentally trigger the elevating mechanism. We think this could have been easily done. Defendant offers no reason why this could not have been done and stands on its contention that these precautions were not necessary because the pedal was so recessed and elevated that it could not be triggered except deliberately. The fact is that the pedal was tripped and all indications are that this was done accidentally.
Plaintiff's expert, Dwayne Gilbert, personally inspected the saw and thought the pedal was exposed enough to be accidentally tripped. Defendant's expert, Don Frydenberg, thought otherwise. He had not seen the saw and relied for his description on that given him by Harold Bridges, who designed the saw, and Leo Johnson, lead man of plaintiff and an employee of Sherwood. He, Frydenberg, understood the pedal was about 6 to 7 inches above floor level and recessed 14 to 16 inches from the front of the table. Bridges testified the pedal was elevated about 7 inches from floor level and, at one point in his testimony, stated it was recessed 12 inches and, at another point, 20 inches. Johnson did not testify as to elevation of pedal but stated that it was 18 to 20 inches back from the front of the table.
We seriously question the accuracy of these statements. It would require a considerable forward extension of the leg and foot to reach the pedal recessed 18 to 20 inches. Further, Bridges testified the saw table itself was only 14 feet wide. We have examined pictures of the pedal. We acknowledge the danger of interpreting these pictures but feel confident that the pedal was much closer to the front of the table and not elevated as much as defendant's witnesses stated. We agree with plaintiff's expert Gilbert that the pedal's location made it subject to accidental tripping.
Thus we conclude that the saw assembly was hazardously defective in lacking guards, in allowing the operator's hands to be near the saw when it was elevated and by exposing the activating mechanism to an accidental triggering. It is noted that these defects cumulate with each other to produce an extremely hazardous overall effect.

LIABILITY OF EXECUTIVE OFFICERS
In Canter v. Koehring Co., 283 So.2d 716 (La., S.Ct.1973) the Louisiana *660 Supreme Court laid down the conditions under which a breach of an employmentagency duty would give rise to a cause of action against the individual breaching such duty by a third person injured as a result of the breach. It stated the criteria to be as follows:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its nonperformance or mal-performance and has nevertheless failed to cure the risk of harm."
The key to Universal's coverage in this case is the expression "executive officer". This term has been dealt with in executive officer suits so popular in the last decade. No precise definition or hard and fast rule has ever been laid down. It appears that the question must be resolved by considering many factors on a case-by-case basis. It is noted that the problem is essentially one of contract interpretation. Any indefiniteness in the expression must be construed against the insurer. In Hadrick v. Diaz, 302 So.2d 345 (La.App., 1st Cir. 1974), several factors to be considered in this determination were listed. We do not think the list is exclusive. There may be other considerations. It is a question of the party's intention. This executive-officer coverage is apparently designed to hold key employees. We think other important considerations would be the value of the employee's services to the employer, the ease with which the employee could be replaced, the importance of the employee's functions to the employer and the extent to which the employee's ordinary functions tend to expose him to liability.
For the purposes of this issue we will assume (most favorably to defendant) that Winston was a separate legal entity from Sherwood and did not, as plaintiff's employer, owe him a duty to provide safe working conditions and equipment. But, through Harold Bridges, it designed and assembled the saw apparatus and was in all respects the manufacturer of it. As such, it owed a duty to all those who might use the saw to design it with all reasonably necessary safety features. See Weber v. Fidelity and Casualty Insurance Co. of New York, 259 La. 599, 250 So.2d 754 (1971).
The saw apparatus in question was actually designed by Harold Bridges and installed under his supervision. The various component parts of the apparatus such as *661 the blades, shaft, cylinders, etc. were manufactured elsewhere, but the final product, as a working unit, was the design and confection of Bridges. He testified that he had copied some of the parts from assemblies he had seen elsewhere but none of the other apparatuses were exactly like the saw in question. In other words, the exact model was his own creation.
Bridges had a high school education and had attended a chain saw school, the exact nature of which is not revealed. Apparently he had no formal schooling in industrial safety design and only a limited experience in this field although he was apparently an ingenious craftsman. He testified that he neither studied publications on safety design nor consulted experts in that field prior to putting together the saw apparatus.
The saw in the Sherwood plant was installed in 1968. Bridges had gone to work for Winston in 1967 as manager of a floor department in one of its plants. Winston was on a crash program to set up as many of these regional plants as possible. Bridges testified that he was in charge of setting up eight such plants. It is not clear why he arose from manager in a floor department to the position he held in which he was in charge of the constructing and setting up of the assembly lines in all these plants. He was designated by Mr. Donald Tidwell, the highest official in the Winston system, for this work. In setting up these plants, he had approximately fifteen men under his supervision. There is some indication in his testimony that at each plant the final authority was vested in the plant manager but we think a fair interpretation of his testimony along with that of Mr. Tidwell, who definitely stated that Bridges was in sole charge of setting up the plant, is that the responsibility for safety in the physical setup of the plant was lodged in Bridges.
It is undisputed that all ultimate authority in the Winston system including its various subsidiaries was lodged in Mr. Donald Tidwell. His functions were on a high administrative level and he actually knew nothing of the saw in question or the details of its working although he was aware that the saw existed and had probably seen it. He had designated Bridges to set up the assembly in the various plants. There was little testimony relative to what he did to determine whether Bridges was competent from a safety standpoint to design and install the saw apparatus. The only thing Tidwell could state was that he (Bridges) was checked out like anyone else and had set up assemblies in their other plants. It is apparent that he did not make sufficient inquiry as to Bridges' competency in safety design. If he had made such inquiry, he would have known that Bridges was not competent in this function. We think Tidwell did not delegate responsibility for safety of the saw apparatus "... with all due care to some responsible subordinate" as required by the fourth criteria as set out in the Canter case, supra. We think this breach is causally related to plaintiff's injury, for if adequate safety design had been put into the saw apparatus, in all probability, it would have been properly guarded and precautions taken to eliminate the necessity of the operator's hands being near the blades while activating the elevating mechanism. We therefore conclude that both Tidwell and Bridges were executive officers of Winston, that they both breached duties imposed on them by the Winston Corporation, that the breach was causally related to plaintiff's accident and that the duties imposed were those which that corporation (Winston) owed to anyone using the saw apparatus including plaintiff.
Within the Sherwood organization at the time was a general manager (Mr. Davis) who was in overall charge of the Sherwood activity including the production phase, the office personnel and sales force. Under him, but almost on the same level of authority, was a Mr. Robert Jackson who *662 was in charge of the plant or the production itself. Jackson had under him five foremen and 80 to 100 employees. He hired and fired these employees. He was clearly an executive officer.
The primary responsibility of safety at the plant was admittedly in Jackson or at least jointly in Jackson and Davis. There was a safety committee composed of employees and some higher echelon personnel but its functions were mostly advisory and for communication purposes. There was some suggestion that reliance for safety was placed in a representative of the insurer, who made periodic inspections of the plant and gave recommendations. We do not think this was a delegation of responsibility for safety away from Jackson. Accordingly, we conclude that Jackson was primarily responsible for safety conditions at the plant. He admitted he was familiar with the saw; he knew how it operated. He knew it had no guard. He was aware of a safety directive to the plant that such saws should be adequately guarded. We think he was negligent in allowing the continued use of the saw without guards and with the blade-elevating mechanism which could be accidently tripped. There can be no doubt that this negligence contributed to plaintiff's injury.

CONTRIBUTORY NEGLIGENCE
Defendant argues plaintiff was contributorily negligent in using gloves contrary to company rules. The evidence is clear that there was such a rule and that plaintiff was wearing gloves when injured. Plaintiff's work at the Sherwood plant the previous year did not involve saws. He had returned to work at this plant a few days before the accident. During that time, he had been assigned to the metal department which required the use of gloves. The evidence is conflicting as to whether plaintiff was put to work on the saw the same morning of his injury (it occurred just before noon) or the previous afternoon. Even if the latter, we do not think he was necessarily cognizant of the rule prohibiting use of gloves.
The lead man over plaintiff was Leo Johnson. He testified that he initially instructed plaintiff not to wear gloves while working the saw and later warned him again and made him remove them. In a statement given to the insurance company a few months after the accident, Johnson did not mention anything about plaintiff's having worn gloves contrary to company rules. Plaintiff denies that he was warned against wearing gloves or made to remove them. John Thompson, a co-employee who had worked the saw just before plaintiff, testified that he was not warned about using gloves. There was ample evidence for the jury to conclude that plaintiff was not informed of the rule against use of gloves and he was not otherwise cognizant of it.
Defendant must show not only that plaintiff was negligent but that it contributed to the accident. There is no evidence that plaintiff's hand was pulled into the saw because of the gloves. The more acceptable inference is that the gloves had nothing to do with plaintiff's hand being cut. Reference is made to the size of the saw, its turning speed and its speed in ascending to the table. There is a substantial basis from which the jury could have concluded that the accident would have happened even without gloves. We cannot say that there was manifest error in the jury concluding to such effect.
In further asserting its plea of contributory negligence, defendant claims the saw's danger was open and apparent and that plaintiff did not take reasonable precautions to protect himself from that danger. To the extent that this argument seeks to deny plaintiff recovery solely because he went to work on the saw at all it must fail completely. The law is well settled that a workman is not to be held contributorily negligent because he does work *663 assigned to him under dangerous conditions for which his employer is responsible and at which assignment he must work or suffer dismissal.
In O'Keefe v. Warner, 288 So.2d 911 (La.App., 1st Ct. 1974) it was said:
"We conclude, as apparently did the jury, that the appellants failed to prove contributory negligence or assumption of the risk on the part of O'Keefe. The duties of his work required him to be where he was, and he was doing his best to discharge those duties.
We agree with the observation by Judge Redmann of the 4th Circuit in a somewhat similar situation:
'. . . a workman's superior cannot create or permit danger and send the workman into it with a warning and escape liability on a theory that the workman was contributorily negligent merely by going into the danger. The workman's only other alternatives are to try to tell his superior how to run the job, or to quit.' Chaney v. Brupbacher, 242 So.2d 627, at 631 (La.App. 4 Cir. 1970)."
See Also: Galloway v. Employers Mutual of Wausau, (La.App. 4 Cir. 1973) 286 So.2d 676, writ refused; Chaney v. Brupbacher, (La.App. 4 Cir. 1970) 242 So.2d 627; Hall v. Hartford Accident and Indemnity Company, (La.App. 4 Cir. 1973) 278 So.2d 795, writ refused; Boure v. New Orleans Public Service, Inc., (La.App. 4 Cir. 1972) 255 So.2d 776, writ refused.
Defendant's main argument towards contributory negligence is that plaintiff was specifically at fault in causing or allowing his hand to get into the path of the blades. Defendant aptly refers to this as "operational carelessness" and relies for its factual basis on the testimony of Floyd Seymore, a co-employee.
Seymore testified he was watching plaintiff from a distance of about 30 feet. He stated that plaintiff turned his head from the operation as if to speak to someone when a board on which plaintiff was leaning slipped and plaintiff's hand went into the path of the saw. The witness was unable to identify anyone near plaintiff to whom he might have been attempting to speak. The first man to plaintiff after the accident did not confirm Seymore's statement. Seymore himself did not get to plaintiff before he (plaintiff) had left and gone to the office for assistance. A thorough investigation of the accident was made by the insurer but it did not discover Seymore's testimony. Leo Johnson, plaintiff's immediate boss, was unable to find a witness to the accident until Seymore happened to mention it to Johnson the Sunday before the trial. This was five years after the accident. Seymore and Leo Johnson were brothers-in-law. They had worked at the plant together from sometime before the accident and were still working there until shortly before trial. It was not explained how Seymore's story did not become known during all this time. The accident was a major happening at the plant. We think the jury would have been fully justified in disregarding the testimony of Seymore.
Plaintiff testified that he was having trouble keeping up and had fallen behind. His recollection of the accident was that he was sliding a 2 by 6 board from right to left and, without otherwise being aware of any mishap, suddenly realized his hand was cut off. He gave no other particulars, and defendant did not cross-examine him.
Plaintiff gave the above testimony as part of his case in chief. The witness Seymore testified as part of defendant's case. After defendant closed, plaintiff was again called to the stand. His counsel produced a statement plaintiff had given an insurance adjuster about 10 days after the accident. Defendant's counsel objected to the use of this statement. After some discussion, the trial judge himself read the statement to the jury.
*664 In that statement, plaintiff stated that he was reaching for lumber and was going to slide it down when he accidentally stepped on the foot pedal causing the saw to rise and that his right hand was then at the blades. He stated that Leo Johnson was right behind him and was the first person to reach him. It is noted that, except for the accidental tripping of the foot pedal and the fact of Leo Johnson's nearby presence, the statement is substantially similar to that given by plaintiff at trial. Defendant urges that the trial court's action in reading the statement to the jury constitutes reversible error, claiming that it was inadmissible, was not proper rebuttal and should not have been read by the judge.
Traditionally, out-of-court declarations by a witness have been held inadmissible. Defendant cites Louisiana cases supporting this rule. The present trend is otherwise. See McCormick on Evidence, Hornbook Series, 2nd Ed., Sec. 251, p. 601; Rule 503 (b) of Model Code of Evidence; Uniform Rules of Evidence No. 63 (1).
Here, the declarant was on the stand subject to cross-examination. His statement was given ten days after the accident whereas the trial was five years later. It was taken by an insurance adjuster representing the defendant. Probably, its value in evidence substantially outweighed possible dangers arising from its so-called "hearsay" nature. The trial judge was in a much better position to gauge this and weigh the competing factors.
We think the better practice would have been to present the statement to the jury in another manner. Perhaps it was more properly part of plaintiff's case in chief, but it did have some rebuttal effect in seeking to overcome the testimony of the witness Seymore. We do not think that any error of the trial judge would justify remand. Our previous discussion of the remand problem is applicable here.
Plaintiff cannot be held contributorily negligent because his hands were at the path of the blade. His job required that he move the lumber across the table. If his hands were where they had to be, he could be found negligent only in tripping the elevating pedal either deliberately or carelessly. There is no basis whatsoever to conclude that the tripping was intentional. The presumption is that one does not intentionally expose himself to a known danger. Whether an accidental tripping was from carelessness or unavoidable as inherent in the operator's task and the pace at which he was to perform is arguable.
At this point we would reconsider the whole nature of the saw apparatus, the duties of the saw operator, the various maneuvers he had to execute in accomplishing his task and the rate of output demanded of him. To say that an accidental tripping of the pedal was necessarily from carelessness and not unavoidable is to ignore the realities of human limitations in these situations.
Much controversy centered around whether plaintiff was properly trained in the use of the saw. We had bypassed this question because we found executive officers negligent in other respects. But we do think plaintiff's actions must be gauged in the light of his training and experience at the time of the accident. He was given a short 20 to 30-minute period of instruction and practice and then expected to operate the saw at the pace of an experienced operator. In operating equipment such as this, there is a rhythm or reflex action that must develop before one can safely maintain the pace. We do not think plaintiff's attempt to keep abreast before he developed a naturalness of operation should now bar his recovery.
It should be noted that the jury was properly instructed as to contributory negligence. The judge even charged them particularly against applying a rule of comparative negligence. We find no manifest error in the jury's refusal to hold plaintiff contributorily negligent.

*665 QUANTUM
It was plaintiff's dominant right hand that was cut. He lost all four of the fingers proper and most of the palm. What remained of his hand was the thumb and that part of the palm attributable to it and to the index finger. The thumb was rotated surgically to give some grasping function between the thumb and the remainder of the hand. Pictures in evidence show the affected member to present a freakish appearance.
The accident occurred April 9, 1970. Plaintiff was hospitalized for eight days immediately following the accident. To effect a skin graft, his hand was attached to the abdomen for about three weeks. He then returned to the hospital for detachment of the hand and remained about six days. In July, he returned to the hospital for three days for the surgery of turning the thumb. During all this time and until his last office visit to the doctor on September 22, 1970, plaintiff had seen the doctor periodically.
At the time of the accident, plaintiff was 20 years old and had completed the eleventh grade four years before. During those four years, he had held several manual laboring jobs. He was earning the minimum wage while working for Sherwood. He did not work after the accident until 1972 when he attended a rehabilitation school and thereafter went to work as mechanic. In April, 1974, he went to work for Brake-O, a concern which specialized in servicing front ends, brakes and shock absorbers. For nine months during 1974 he earned approximately $9,000 at that work. A few weeks before trial, he was transferred from Brake-O's central shop in Dallas to another shop in Arlington, Texas. The Brake-O firm specialized in quick servicing of the needed mechanical work. The evidence shows that plaintiff was transferred to the Arlington, Texas, shop because of his inability to render the fast service required at the main Dallas shop.
Plaintiff introduced the deposition of Mr. Albert Tamaz who was service manager at Brake-O's central shop in Dallas. He testified that plaintiff was a good worker but was substantially restricted by his handicap. Plaintiff was paid on a piecework basis. Mr. Tamaz's testimony as to the amount of diminished earning capacity plaintiff suffered at this job in comparison to the other mechanics is somewhat confusing. Suffice it to say that this testimony could be interpreted to indicate that plaintiff's handicap caused him a loss in wages of anywhere from $2,500 to $5,000 per year.
The only medical testimony was that of Dr. David Henry who had not treated plaintiff but evaluated him shortly before the trial. He described generally the condition of plaintiff's hand, noted a decrease in flexion of the wrist because of scar tissue and the skin graft, observed that the abnormal functioning of the joints had shown some arthritic changes and thought that plaintiff would suffer increasing impairment over the years because of the arthritis. He noted that plaintiff's hand was of no value for fine movements or precise functions and fixed a 60 to 70 percent loss of function of the hand and a 35 to 40 percent impairment of plaintiff as a total human being in all fields of human endeavor.
Plaintiff presented Dr. David Townsend, a professor of finance and economics at Northwestern State University as an expert in the field of economics and finance. This expert proceeded to calculate the present value of plaintiff's loss of earnings over the next 45 years with an assumption that his present annual loss of earnings was $5,000. He discussed economic history generally and explained the various factors involved in determining the real purchasing power of the dollar and the extent to which it is affected by changing conditions over the years. He also considered such things as rate of increase in wages as compared to price increases, variations in interest rates, plaintiff's restricted opportunities *666 in a competitive labor market and other similar factors. Without going into any specific statistics regarding the past history which he used to project the future economic developments, he stated that a discount should not be applied because it would be offset by the other mentioned factors. He computed the present value of plaintiff's future loss of wages at $225,000 by multiplying $5,000 (the assumed annual wage loss) by 45 (the number of years of life expectancy left to plaintiff).
Defendant contends that plaintiff cannot use a $5,000 per annum loss. The argument is that plaintiff was making about half that amount at time of injury and such use would be contrary to the rule requiring minimization of damages and that plaintiff cannot be choosing his particular trade increase his loss of earnings. We completely and emphatically reject that argument. Wages at time of injury are usually suggestive of the individual's future earnings. This is not an absolute unvarying rule. In many instances, changes in work and increase of earnings would be more probable. The law does not destine an injured party to his situation at the time of injury. It would be unrealistic and unjust to accept defendant's argument. In Edwards v. Sims, 294 So.2d 611 (La.App., 4th Cir. 1974) it was said:
". . . Moreover, loss of wages can properly be computed on the amount the plaintiff would in reasonable probability have been earning at time of trial, although he was earning less at the time of the accident. James v. State, 154 So. 2d 497 (La.App., 4th Cir. 1963)."
Defendant further argues that the $5,000 figure is not shown as yearly loss of earnings and it is probably half that amount. This was a matter for the jury's determination. It is further argued that the number of probable earning years left to plaintiff should be 41 (65, the usual retirement age, less 24 years, plaintiff's age at time of trial) instead of 45 used by the expert. We agree with that argument.
Defendant figures the present worth of plaintiff's future loss of earnings to be $61,000, claiming this invested at 7½ percent would fund a $4,800 annuity for 40 years and that the $225,000 figure used by the expert would fund an annuity of $17,800.
Defendant claims inflation is not a proper factor for jury consideration and cites two federal 5th Circuit cases as authority. The Louisiana jurisprudence recognizes inflation as a factor to be considered. See Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891 (1960); Edwards v. Sims, 294 So.2d 611 (La.App., 4th Cir. 1974).
We note that an award for loss of future wages is generally subject to the "much discretion" rule. See McFarland v. Illinois Railroad Co., 241 La. 15, 127 So.2d 183 (1961); Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968); Edwards v. Sims, 294 So.2d 611 (La.App., 4th Cir., 1974). To an extent, there are factors going into such an assessment that can be precisely determined such as a discount factor. But that determination is filled with uncertainties peculiar to the particular case and uncertainties requiring consideration of future economic trends. These are exceedingly speculative and difficult to gauge.
No evidence was put in regarding medical expenses. The amount of lost wages between injury and trial would be negligible in considering whether the $350,000 verdict was proper. It is noted that the verdict was a general award for all damages. The trial judge refused to disturb it under the rule in Parks v. Liberty Mutual Ins. Co., 291 So.2d 505 (La.App., 2nd Cir. 1974) upon the view that the damages were not separately and fairly ascertainable.
We do not know to what extent the award was for loss of future wages and to what extent it represented pain, suffering, humiliation, inconvenience and the deprivation of the loss of the hand's function for *667 purposes other than wage earning. All we can do is decide whether the total of the maximum permissible awards would reach that $350,000 figure.
Dr. Townsend's testimony that the discount should be disallowed because of the offsetting effects of future economic prospects (devaluation of the dollar) was to a great extent conclusory. There was no specific statistical basis for this result, and no stated formula was used in arriving at his opinion. We are now more than ever cognizant of the dollar's devaluation, but that expert's conclusion would require a finding that for each of the next forty years the 1975 dollar would be worth only one-fourth to one-third its present value. Perhaps the dollar will devaluate to that extent after forty years, but its average value for each of those years would hardly decrease to one-fourth or one-third its present worth. If the 1975 dollar was devaluated at a steady rate of decline to zero over the next forty years, its average value during each of those forty years would be 50 per cent of its present value. However, we do think that the jury would be justified in assessing a substantial amount in excess of the discounted value to adjust for the decreased purchasing power of the dollar in the future, the lessened employment opportunities due to the handicap and the real possibility that later arthritic changes will decrease the hand's function.
We have considered the many cases cited by counsel for the purpose of determining the outer permissible limits for the other damage elements, that is, pain, suffering, inconvenience, etc. That review convinces us that other cases can be helpful only to determine whether there has been an abuse of the "much discretion" and cannot serve as guides to a specific award. It would serve no useful purpose to discuss all the cases cited by both counsel. We conclude that the award in this case is within the "much discretion" which must be accorded to the trier of fact and will not be disturbed.[1]
Accordingly, the judgment of the district court is amended so as to dismiss the suit as to Winston Industries, Inc. and as thus amended it is affirmed. All costs of this appeal are to be borne by appellant, Universal Underwriters Insurance Company.
Amended and affirmed.

ON REHEARING
Before HOOD, CULPEPPER, DOMENGEAUX, GUIDRY and PAVY, JJ.
CULPEPPER, Judge.
We granted defendants' application for a rehearing limited to a consideration of whether the quantum of the award must be reduced.
The accident occurred on April 9, 1970. The injury consisted of the loss of four fingers of plaintiff's right hand and part of the palm. What remains is the thumb and that part of the palm attributable to it and to the index finger. The thumb was rotated surgically to give a grasping function between the thumb and the remainder of the hand. Although plaintiff has a permanent partial loss of use of the hand, it is useful. He can do intricate mechanical work with it and can use it for his daily personal needs and activities.
Plaintiff was hospitalized on three different occasions for skin grafts and for rotating the thumb, making a total of 17 days in the hospital. He was under medical care for a total of about six months from the date of the accident. There were no complications. There are no sensitive areas in the hand. There is some decrease in flexion of the wrist because of scar tissue and the skin graft, but no other part of his body is affected. Dr. Henry, the only expert medical witness, testified that in the years to come there may be some arthritic changes in the remaining joints of *668 the hand which would increase the impairment to some unknown degree. Dr. Henry estimated plaintiff has lost 60% to 70% of the function of the hand.
At the time of the accident, plaintiff was 20 years old and had completed the 11th grade four years previously. During those years, he had held several manual labor jobs earning the minimum wage of $1.90 per hour and had averaged about $2400 per year.
Plaintiff had no earnings during the remainder of 1970 nor during the year 1971, because he was under treatment, and he attended a rehabilitation school, learning to be an automobile mechanic. In 1973 he went to work as an automobile mechanic, performing such tasks as overhauling motors, putting in piston rings and pistons, installing water pumps and fuel pumps, etc. According to his income tax returns, he earned $4,636.02 in 1973, and $8,968 in 1974. Thus, from the time of the accident in 1970 to the time of the trial of this case in April of 1975, plaintiff's earnings had more than tripled.
To prove loss of future income, plaintiff introduced the testimony of Albert Tamaz, who was the service manager at the automobile brake shop in Dallas where plaintiff was working at the time of the trial. He testified that plaintiff was then working on a piece-work basis, and that, although he was a good worker, he was handicapped by his disabled right hand. As we stated in our original opinion, the testimony of Mr. Tamaz as to the amount of diminished earning capacity plaintiff suffered at his job is vague, but, essentially, it is that since it takes plaintiff longer than it does other mechanics to perform each piece of work, he was losing wages of $2500 to $5000 per year while working on a piecework basis, instead of a salary.
Then plaintiff introduced the testimony of Dr. David Townsend, a professor of finance and economics at Northwestern State University in Natchitoches. Starting with an assumption that because of the partial loss of use of his right hand, plaintiff was losing $5000 per year in earnings at his present job in Dallas, the professor then calculated that since plaintiff was 20 years old at the time of the accident, his life work expectancy to age 65 was 45 years. He then simply multiplied 45 times $5000 and concluded that plaintiff would lose $225,000 in earnings. This argument was stressed and emphasized to the jury by plaintiff's counsel.
The verdict of the jury reads simply "We, the jury, has (sic) reached the verdict as following, (sic) in favor of plaintiff in the sum of $350,000." There is no indication in the verdict or otherwise as to how much the jury awarded for general damages, how much for loss of past wages or how much was for loss of future earnings. There was no evidence presented as to any past or future medical expenses, and hence this could not have been an item of the award.
We note at the outset that although the defendant filed an application for a new trial or, alternatively, for a remittitur of that amount of the award in excess of $50,000, the trial judge denied both. He denied the application for new trial on the grounds that there was sufficient evidence to reasonably support the finding of liability by the defendant. But the trial judge denied the application for a remittitur on the express grounds that under Parks v. Liberty Mutual Insurance Company, 291 So.2d 505 La.App. 2nd Cir., 1974) the trial court did not have the authority to order a remittitur since the verdict was not itemized and the amount of general damages could not be separately and fairly ascertained. The trial judge in this case was serving by assignment on the panel of the Second Circuit Court of Appeal which decided Parks, and so he followed that holding.
In Miller v. Chicago Insurance Company, La., 320 So.2d 134 (1975), our Supreme Court expressly overruled Parks *669 and held that the trial judge does have the authority to order a remittitur even in those cases where the jury award is one lump sum covering both general damages and special damages.
Thus, the present case is different from the usual one in that here the Court of Appeal is the first judicial body to review the quantum of the jury verdict. Although this does not change the rules of appellate review by which we are bound, it is noteworthy that this is the first judicial review of the quantum of the award in this case.
In Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971), the court reviewed the then jurisprudence and succinctly stated the rule of appellate review of quantum as follows:
"From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the `much discretion' accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity."
In the more recent case of Anderson v. Welding Testing Laboratory, Inc., La., 304 So.2d 351 (1974) the rule of appellate review is stated as follows:
"The appellate review of awards for general damages is limited to determining whether the trial court abused its great discretion. The adequacy or inadequacy of an award should be determined on the basis of the facts and circumstances peculiar to the case under review, having in regard also that the trier of fact has the advantage of seeing the witnesses and evaluating their testimony, including that of residual pain. The awards made in other cases provide no scale of uniformity; their use is limited to serving as an aid to determine, if the present award is greatly disproportionate to similar awards (if truly similar), whether an issue of abuse of discretion may exist in the present case. In any event, an abuse of trialcourt discretion must be clearly demonstrated by the record before an appellate court will tamper with an award of general damages."
Plaintiff argues that under the above stated rules of appellate review, our Supreme Court has in effect mandated that courts of appeal shall not modify awards of general damages by the trial courts. This prompted us to research the jurisprudence during the last three years for cases in which the courts of appeal have modified awards of general damages made by the trial courts, and in which our Supreme Court has refused to grant writs. We find the following cases:
(1) In Stevens v. Gulf American Fire & Casualty Company, 317 So.2d 199 (La. App. 1st Cir., 1975) the trial court awarded general damages in the sum of $30,000. The Court of Appeal reduced the award to $5,000. The Supreme Court denied writs on the grounds that: "On the facts found by the Court of Appeal, the result is correct." (321 So.2d 363).
(2) In Reggans v. Aetna Casualty & Surety Company, 308 So.2d 898 (La. App. 2nd Cir., 1975), the trial court awarded plaintiff $44,104, of which approximately $43,000 was for general damages. The Court of Appeal reduced the award for general damages to the sum of $15,000. The Supreme Court denied writs on the grounds that: "On the facts found by the Court of Appeal, there is no error of law in the judgment." (310 So.2d 642).
(3) In LeBlanc v. Roy Young, Inc., 308 So.2d 443 (La.App. 3rd Cir., 1975) a jury awarded $50,000 in a lump sum to a 28 year old oilfield laborer for a permanently disabling knee injury. We increased the award to $100,000, to cover both general damages and loss of future earnings. The Supreme Court denied *670 writs for the reason: "Under the facts found, there is no error of law." (313 So.2d 240).
(4) In Cornish v. Ford, Bacon & Davis Construction Corporation, 304 So.2d 361 (La.App. 1st Cir., 1974), the trial court awarded plaintiff $25,000 as general damages. The Court of Appeal reduced the award to $15,000. The Supreme Court denied writs stating: "On the facts found by the Court of Appeal, there is no error of law in its judgment." (305 So.2d 123).
(5) In Eymard v. McKinnon, 302 So.2d 56 (La.App. 4th Cir., 1974), a jury awarded $26,500 in general damages, plus some special damages. The Court of Appeal reduced the award of general damages to $7,500. The Supreme Court denied writs on the ground: "The rationale of the so-called `majority' opinion is not accepted but we find no error in the result under the facts." (305 So.2d 132).
(6) In Watts v. Town of Homer, 301 So.2d 729 (La.App. 2nd Cir., 1974), the trial court awarded $250,000 for personal injuries to plaintiff's minor daughter. The Court of Appeal reduced the award to $150,000. The Supreme Court refused writs on the grounds: "On the facts found by the Court of Appeal, we cannot say the result presents error." (305 So. 2d 130).
(7) In Hoffman v. All Star Insurance Corporation, 288 So.2d 388 (La.App. 4th Cir., 1974), a jury awarded the plaintiff Hoffman $20,000 in general damages, and the plaintiff Spadafora the sum of $3,500. The Court of Appeal reduced Hoffman's award to $5,000 for his general damage, and reduced Spadafora's award to $2,000. The Supreme Court refused writs on the grounds: "On the findings of fact of the Court of Appeal, there is no error of law in its judgment." (290 So.2d 909).
(8) In Smith v. Manchester Insurance & Indemnity Company, 299 So.2d 517 (La.App. 4th Cir., 1974), the trial judge awarded $212,994.07 in a death action. The Court of Appeal reduced the award for loss of support from $62,000 to $55,907.50, reduced the award to the decedent's major children for loss of love and affection from $20,000 each to $10,000 each, and reduced the award to another plaintiff from $7,529.20 for physical pain and suffering to the sum of $1,029.20. The Supreme Court denied writs for the reason that: "The result is correct." (302 So.2d 617).
(9) In Simmons v. Travelers Insurance Company, 295 So.2d 550 (La.App. 3rd Cir., 1974), a jury awarded a 25 year old welder $132,500, which included about $40,000 in medical expense. We increased the award by $115,000. The Supreme Court denied writs on the ground that: "On the facts found, the result is correct." (299 So.2d 795).
(10) In Orfanello v. Pepsi Cola Bottling Company, 290 So.2d 353 (La.App. 4th Cir., 1974), the trial court awarded one of the plaintiffs $6,500 for a serious neck injury. The Court of Appeal increased the award to $25,000. The Supreme Court denied writs, stating: "There is no rror of law in the judgment of the Court of Appeal." (293 So. 2d 178).
(11) In Valence v. State, 280 So.2d 651 (La.App. 1st Cir., 1973), the trial court awarded $75,000 as general damages. The Court of Appeal reduced the award to $25,000. The Supreme Court denied writs on the ground that: "On the facts found by the Court of Appeal, we find no error of law in its judgment." (282 So.2d 517).
(12) In Wright v. Romano, 279 So.2d 735 (La.App. 1st Cir., 1972), the trial court awarded $55,000 as general damages for injuries to a minor child. The Court of Appeal increased that award to $85,000. The Supreme Court denied writs, stating, "We find no error of law in the judgment complained of." (281 So.2d 757).

*671 (13) In Griffith v. Bodden, 273 So.2d 609 (La.App. 1st Cir., 1973), the trial court awarded plaintiff $3,000 as general damages. The Court of Appeal reduced the award to $1,000. The Supreme Court denied writs, stating: "On the facts found by the Court of Appeal, the result is correct." (277 So.2d 448).
(14) In Funderburk v. Temple, 268 So. 2d 689 (La.App. 1st Cir., 1973), the trial court awarded four plaintiffs respectively the sums of $750, $500, $300 and $500 in general damages. The Court of Appeal reduced the awards to $400, $250, $150 and $300 respectively. The Supreme Court refused writs, stating: "On the facts found by the Court of Appeal, there is no error of law in its judgment." (270 So.2d 875).
(15) In Manuel v. Missouri Pacific Railroad Company, 264 So.2d 376 (La. App. 3rd Cir., 1972), the trial court awarded $40,550 in general damages for injuries to a minor child. The Court of Appeal reduced that award to $17,000. The Supreme Court denied writs on the grounds that: "On the facts found by the Court of Appeal, we cannot say that there is an error of law in its judgment." (262 La. 1125, 266 So.2d 432).
(16) In Brown v. Employers Commercial Union Insurance Company, 316 So. 2d 194 (La.App. 4th Cir., 1975), the trial court awarded $20,000 in general damages. The Court of Appeal reduced the award to $9,500. The Supreme Court denied writs for the reason: "On the facts found by the Court of Appeal, there is no error of law in the judgment complained of." (320 So.2d 204).
(17) In Lea v. Bougon, 312 So.2d 903 (La.App. 4th Cir., 1975), a jury awarded plaintiff $48,300 in general damages. The Court of Appeal reduced that award to $22,500. The Supreme Court denied writs, stating: "On the facts found by the Court of Appeal, there is no error of law in its judgment." (317 So.2d 627).
(18) In Addison v. Travelers Insurance Company, 281 So.2d 805 (La.App. 1st Cir., 1973), a jury awarded one of the plaintiffs $1,000 in general damages and the other $10,000. The Court of Appeal reduced these awards to $300 and $5,000 respectively. The Supreme Court denied writs, stating: "On the facts found by the Court of Appeal, there is no error of law in its opinion." (283 So.2d 499).
(19) In Sticker v. General Foods Corporation, 324 So.2d 568 (La.App. 1st Cir., 1976) the Court of Appeal reduced an award of $5,000 for general damages to the sum of $1,500. The Supreme Court denied writs on February 17, 1976, 326 So.2d 380.
In the following cases there was no application for writs to the Supreme Court, but the Courts of Appeal did modify the awards of general damages by trial courts. In Rodriquez v. Trebitz, 304 So.2d 396 (1st Cir., 1974), awards of $60,000 and $35,000 respectively were reduced by the Court of Appeal to $35,000 and $20,000. In Tamplain v. Collinswood Poultry Company, 279 So.2d 277 (4th Cir., 1973), the Court of Appeal reduced a $30,000 award to the sum of $6,500.
The above cases establish clearly that our Supreme Court has not taken, and does not intend to take, from the Courts of Appeal the right to review the quantums of awards made by trial judges and juries including the awards of general damages.
Under the rules of Appellate Review established by our Supreme Court, as quoted above, we will now examine the jury award of $350,000 in this case. Our Supreme Court has stated that as an aid in determining whether the jury has abused its discretion, we may consider the awards in other similar cases, not to provide a scale of uniformity, but to determine whether the award in the present case is so greatly disproportionate to awards in other cases that a clear abuse of discretion is demonstrated.
*672 In Fowler v. Gulf Insurance Company, 306 So.2d 406 (La.App. 3rd Cir., 1975), the plaintiff, an attorney, suffered a severe injury to his right hand with "disastrous" post-operative infection resulting in a 100% functional loss of use of the hand. The decision describes the plaintiff's injuries as follows: ". . . plaintiff's right hand is small and atrophied; the skin is shiny and slick; the fingers are frozen in a fixed position; and the hand amounts to nothing more than a claw. The trial court stated that plaintiff's ability to try cases and check titles is impaired, his social life is affected, and he is unable to participate in many hobbies and sports." The facts also show that plaintiff was hospitalized for 60 days and experienced an unusual amount of pain and suffering because of the severity of the injury to the tissue, tendons, and nerves, and because of the post-operative infection. A jury awarded $40,000 for pain and suffering and $50,000 for disability, making a total of $90,000. We affirmed.
In Anderson v. Welding Testing Laboratory, Inc., La., 304 So.2d 351 (1974), a 57 year old welder suffered a 50% loss of use of the right hand. He could no longer climb or perform other duties of his former occupation. His right hand had a permanent intolerance to cold or heat, and he could no longer work as a welder. At the time of the trial, five years after the injury, the hand was still swollen, he could not close it or extend it entirely, he could only grip with the last two fingers, and he still had pain. The trial court awarded $25,000 in general damages. The Court of Appeal reduced the award to $10,000. The Supreme Court granted writs and increased the award back to $25,000.
In Simmons v. Travelers Insurance Company, 295 So.2d 550 (La.App. 3rd Cir., 1974), plaintiff suffered 45% to 50% loss of use of his right arm, 25% loss of use of his left arm and 10% to 15% loss of use of his right knee. At the time of the injury, plaintiff was 25 years of age and was earning approximately $10,000 per year as a welder or iron worker. The trial court awarded a lump sum of $132,500, which included about $40,000 in medical expenses required by his very severe injuries. We increased the award by $115,000 for loss of future wages, since plaintiff was totally disabled from returning to work as a welder or iron worker. The total award was $247,500. The Supreme Court denied writs.
In Harper v. New Orleans Public Service, Inc., 300 So.2d 546 (La.App. 4th Cir., 1974), the plaintiff, a 23 year old man, became a paraplegic as a result of his injuries. He suffered second and third degree burns over 35% to 40% of his body, a broken back with compression of the spinal cord, his right hand and left leg above the knee were amputated, the hip bone was shaved down and partially removed, he is completely paralyzed below the chest, has no control over his body, bowels, or sexual functions. He is required to urinate through a tube inserted through the abdomen into the bladder. At the time of the injury, he was earning $6,000 per year and, of course, he is totally disabled from earning any further wages during the remainder of his life. His past medical expenses were $27,553, and future medical expenses were projected at $14,400 with additional monthly expenses for drugs. The trial judge awarded $350,000. The Court of Appeal found the award was neither inadequate nor excessive. The Supreme Court denied plaintiff's application for writs, 303 So.2d 182, for the reason: "The judgment complained of is correct."
In Von Cannon v. State Department of Highways, 306 So.2d 437 (La.App. 3rd Cir., 1975), a 47 year old beauty shop operator suffered severe injuries requiring amputation of her right leg, leaving a nine inch stump, fractures of facial bones, fractures of her jaw, loss of teeth, leaving permanent loss of facial sensation, fractures to both shoulders, pelvis, left hip and left ankle, requiring prolonged treatment and leaving *673 a residual disability of left leg. We affirmed an award of $141,830.10.
In Gordon v. General Motors Corporation, et al., La.App., 323 So.2d 496 (decided recently) plaintiff sustained a laceration over the right eye, comminuted fracture of the wrist with the bone protruding from the left forearm, comminuted fracture of the upper tibia and fibula with the bone protruding from the proximal portion of the left leg, a massive fracture of the left hip, and gross fractures of six teeth. Plaintiff was unable to ambulate without crutches, a nerve in his left ankle was injured, preventing him from walking on his heel, he had a perennial palsy, a complete foot drop, surgery was required to replace his hip. He was hospitalized on several occasions, the first time for 54 days, and on another occasion for 17 days, and he was unable to return to his employment as a welder. His average annual salary was $13,153.36, and he was totally and permanently disabled. We affirmed an award of $467,000.
Of course, in the present case we don't know whether the award of $350,000 was all for general damages. However, assuming that it was and using the above cases to determine whether $350,000 is greatly disproportionate to awards in similar cases, and in cases involving much worse injuries and disabilities, we conclude the award here is a manifest abuse of the jury's discretion. We think the highest award which can be allowed in this case for general damages is the sum of $75,000.
We now consider the claim for lost earnings. Counsel for defendant-appellant urges that although the jury returned a general verdict, it must be concluded that $225,000 of this award was for loss of earnings. He states this is apparent from the fact that plaintiff's counsel stressed to the jury that plaintiff would have a working life expectancy of 45 years and a loss per year of $5,000 in his new trade as an automobile mechanic. Defendant urges that since $225,000 of the total award is for future earnings, it is excessive for the reason that a new job classification of an injured plaintiff is not the proper basis upon which to compute loss of earnings. He suggests that a plaintiff "takes his victim as he finds him" and that thus the proper basis for an award is the job at which plaintiff worked prior to his injury. He makes a persuasive argument that basing a lost earnings award on post-accident job earnings allows a plaintiff to maximise his damages rather than to mitigate them.
On the other hand, counsel for plaintiff correctly suggests that where a general verdict is returned by a jury, it is impossible to ascertain what portion of that verdict is to compensate for earnings and what portion is to compensate for other general or special damages. Therefore, he suggests that there is no basis for assuming the award grants too great an amount for loss of earnings.
Though it would be mere speculation to say that a certain portion of the general verdict was for lost earnings, we might surmise that, considering plaintiff's counsel's argument to the jury and the fact that the above method of computation was emphatically repeated to it, a great proportion of the general verdict was probably for lost earnings. However, we find such a conclusion nonessential to a proper determination of this matter.
We agree that a rule basing loss of future earnings solely on earnings in a new job obtained after an accident could allow plaintiffs to effectively maximize their damages. Under such a rule, whatever job plaintiff chose after an accident, he could always say "but for the accident I would be making even more at this new job." Thus, such a rule cannot be strictly followed in every case.
Our law, of course, has always required that a party mitigate his damages. Riley v. Frantz, 253 So.2d 237 (La.App. 4th Cir., 1971) and Desselle v. Wilson, 200 *674 So.2d 693 (La.App. 3rd Cir., 1967). If we followed this rule strictly here, the plaintiff has proved absolutely no loss of earnings. At the time of the accident, he was employed as a laborer and had an annual income of $2400. At the time of the trial, four years after the accident, he was employed as an automobile mechanic and was earning about $9,000.
This is not the usual case where lost earnings are determined by simply subtracting the post-injury income from that of the plaintiff prior to the injury. Here, plaintiff was only 20 years of age at the time of the accident. He had not finished high school and had no skilled trade. His earnings were low, he having only recently entered the job market. But, subsequent to the accident, he changed jobs and substantially increased his ability to earn.
The present case is similar to Honea v. Matson Navigation Company, 336 F.Supp. 793 (N.D., Cal.1972). The court considered the issue of lost wages and stated as to the plaintiff in that case:
" . . . frankly speaking, we see no reason why, after a period of rehabilitation following another operative procedure, he could not readily earn as much, and probably more, than he earned in 1968, his last and highest full year of work. A future loss of earnings is not controlled by a particular occupation such as a room steward or waiter. While Honea's preference may be along these lines, his prior experience and education point to a more successful endeavor in other fields. Allowing a reasonable period for rehabilitation, including time to secure suitable employment and advance training or same, we conclude that his earning loss should terminate at the expiration of four years. . ." (emphasis added)
It should be appropriate to consider the fact that plaintiff had only recently entered the job market at the time of the accident in determining a proper award for loss of income. It would be unfair for us to consider only plaintiff's income at the time of the accident under these circumstances. Conversely, as suggested earlier, neither will we allow a plaintiff to maximize his damages by claiming lost income based solely on postaccident employment.
Some applicable guidelines for determination of an award for loss of earnings were succinctly stated by our Supreme Court in the case is Viator v. Gilbert, 253 La. 81, 216 So.2d 821:
"Thus is appears that plaintiff is entitled to recover for whatever loss of future earnings he will sustain as a result of the accident. In attempting to arrive at the correct measure of damages for this item, it is essential that we direct attention to plaintiff's physical condition prior to the accident, his work record, the amount of his earnings and the probability or improbability that he would have been able to earn similar amounts for a number of years but for the disability brought about or aggravated by the 1965 accident. Then, too, consideration must be given to the settled jurisprudence of his Court that allowance of monetary damages for loss of future earnings (or support of dependents in case of death) cannot be calculated with mathematical exactitude; that they are speculative in character and the `* * * most that the courts can do * * * is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either.' Dobyns v. Yazoo & M.V.R. Co., 119 La. 72, 43 So. 934. See also Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891; McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183, 87 A.L.R.2d 246; and Pennington v. Justiss-Mears Oil Company, 242 La. 1, 2, 134 So.2d 53."
It seems then that not only does loss of earnings require no mathematical *675 proof, but that in fact it is improper to attempt to calculate such a loss with mathematical exactitude. Rather, all of the above considerations should be pertinent in such a calculation. As stated in Viator, supra: "The most that courts can do in fixing awards for loss of future earnings is exercise its sound discretion and award such amounts as will, under the circumstances of each case, appear just to both litigants." See also Stevens v. Liberty Mutual Insurance Company, La.App., 133 So.2d 1, and Reeves v. Louisiana & Arkansas Railway Company, 304 So.2d 370 (La. App. 1st Cir., 1974).
Considering these observations and also considering the observation that, due to plaintiff's education and experience he is required to rehabilitate himself after an accident and attempt to secure employment compatible with his new limitations, as suggested in Honea (above), we conclude that the amount of $65,000 is sufficient to compensate him for any future lost earnings. This amount, if invested in safe, low risk investments, will yield, at an annual percentage rate of 7½%, the amount of $5,000 per year. At the end of plaintiff's expected work life of 45 years, he will still retain the principal amount.
For the reasons assigned, the judgment appealed and affirmed on original hearing in this Court is amended to reduce the award from the sum of $350,000 to the sum of $140,000. All costs of this appeal are assessed against the defendant-appellant.
AFFIRMED, AS AMENDED.
PAVY, J., concurs only to the extent of reducing the award to $200,000.
DOMENGEAUX, J., dissents and assigns reasons.
DOMENGEAUX, Judge (dissenting).
I respectfully dissent.
The majority has cited a large number of recent cases for the proposition that the Courts of Appeal in this state are vested with the authority to overrule the decisions of the trier of fact relative to general awards and that the appellate courts may freely substitute their own opinions in the area of general damages. While I find that several of the cases relied upon by the majority in support of this position may be distinguished for various reasons, I frankly concede the fact that a disturbingly significant number of the abovementioned cases do represent situations in which the Courts of Appeal have chosen to disregard the findings of the trial court.
I am compelled to disagree with the abovementioned line of jurisprudence. The basic statutory authority pertinent to appellate review of damage awards is found in Civil Code Article 1934, paragraph three.
"In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, but are bound to give such damages under the above rules as will fully indemnify the creditor, whenever the contract has been broken by the fault, negligence, fraud or bad faith of the debtor." (Emphasis added)
I am of the opinion that the above cited codal provision was properly construed in the cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963), and Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). I find the following language from Lomenick particularly relevant:
". . . these [appellate] courts must give effect to the basic law set out in Article 1934(3) of our Civil Code that in the assessment of damages in cases of offenses and quasi offenses `much discretion must be left to the judge or jury'. This law is plain and means what it says, and it is the duty of all appellate courts to follow it. Under this rule the amount of damages assessed by the judge or jury should not be disturbed unless the appellate court's examination of the facts reveals a clear abuse of the discretion *676 vested in the lower court." (Emphasis added) (Brackets added)
Since I feel that Civil Code Article 1934(3) and the Gaspard and Lomenick cases and their progeny[1] are straightforward and solid authority in support of the presumed integrity of awards at the trial level, I find that the decisions relied upon by the majority represent an erosion of the rules enunciated by the Civil Code and the Supreme Court. It appears to me that our Courts of Appeal sometime willingly acknowledge the existence of C.C.1934(3) and Gaspard and Lomenick but have not chosen to pay them heed. In that respect, the authorities upon which I would rely seem to have become nothing more than paper tigers.
I believe that our appellate courts are sometimes too eager to find an abuse of discretion on behalf of the trial courts relative to this matter of general awards. I respectfully submit that the Courts of Appeal should re-examine their position on this "abuse of discretion" issue and realistically follow the aforementioned statutory and jurisprudential mandates. In view of these appellate departures, perhaps it would be well for the Supreme Court to clarify our appellate duties and limitations insofar as disturbing trial court awards is concerned.
Addressing myself to the instant litigation I am unable to discover an abuse of discretion on the part of the trial jury. Obviously each case rests upon its own facts, and there is considerable danger in attempting to analogize and compare personal injuries and commensurate compensation. In fact our courts have held that the particular nature of an injury has very little significance in determining the amount of damages recoverable. See, for example, Jenkins v. Dixie Rental Tools and Casing Crews, Inc., 283 So.2d 271 (La.App. 1st Cir., 1973), writ refused La., 285 So.2d 542; and Brouillette v. State, Through Department of Highways, 275 So.2d 196 (La.App. 3rd Cir., 1973).
Regarding the award for general damages in this litigation the majority has decided that the highest amount recoverable is $75,000. I must admit that I am completely at a loss to discover how the majority arrived at this figure, and I must conclude that it is nothing less than arbitrary. Why not set the award at $25,000 or $79,132.67, or $82,392.11, etc.? In this case we are faced with a plaintiff who is a young man (20 years old), unmarried, on the fringes of the sphere of adult social activity. The plaintiff has retained but a stump of his former hand which, under the best conditions, has a grotesque appearance and bears similarity to a crab claw. In fact, I am of the opinion that this plaintiff would have been better off if he had lost his entire hand and had been fitted with a prosthetic device, the presence of which is more readily accepted by our society. I do not believe that the members of this court are in a position to fully appreciate the loss which this young man has suffered nor the future humiliation and other emotional side effects produced by the loss of the appendage. For this reason, I would not tamper with the jury award of $350,000 which obviously was intended to compensate plaintiff for pain, suffering, disability, extreme humiliation, as well as loss of future wages. I believe that the jury was in a much better position, being on the ground floor, to evaluate this plaintiff's injury and loss and for that reason I would leave it's award untouched as to the amount which the majority has speculated to be possibly "general damages".
Particularly relevant to this litigation is the case of Walker v. Champion, 288 So. 2d 44 (La.1973). In Walker an 18-year *677 old unmarried, unskilled plaintiff lost an eye. The trial court awarded general damages of $100,000.00; the Court of Appeal (274 So.2d 840) found the award to be inconsistent with the jurisprudence and reduced it to $35,000.00. The Supreme Court, however, found no abuse of discretion by the trier of fact and reversed the Court of Appeal, reinstating the trial court's award of $100,000.00. The lone dissenting justice on the Supreme Court cited cases in which compensation for the loss of an eye ranged from $12,000.00 to $31,000.00. However, even though the award in Walker was more than triple that of the next higest case cited, the majority of the high court remained unimpressed and upheld the original award. I find the Walker case and the actions of the majority in the instant litigation to present an irreconcilable conflict.
I find it significant that there has been considerable disagreement on this panel concerning the total amount of damages which should be awarded to the plaintiff. Of the original panel, one other judge and I voted to affirm the trial jury award; the third judge thought that the award should be reduced to $250,000. On fivejudge re-argument the judge from the original panel who formerly voted to affirm the quantum now votes to reduce to $140,000, and he is joined therein by the two new members of the panel; the judge who originally was of the opinion that the award should be reduced to $250,000 now feels that it should be reduced to $200,000. As is evident by this dissent, it is my opinion that the award should be affirmed.[2] This difference of opinion classicly demonstrates one of the reasons why appellate. courts should exercise caution in substituting their opinions for those of the triers of fact in such matters.
In reference to the portion of the award dealing with loss of future wages, the majority feels that $65,000 is adequate, and engages in some implied speculation to the effect that the original award intended to compensate plaintiff to the tune of $225,000 for diminished future earning capacity. The majority would rely upon the case of Honea v. Matson Navigation Company, 336 F.Supp. 793, a 1972 case from the Federal District Courts of California. The majority feels that Honea stands for the proposition that plaintiff is "required to rehabilitate himself after an accident and attempt to secure employment compatible with his new limitations. . ." I submit that such is not the applicable law in the state of Louisiana. I feel that, in this state, this plaintiff is entitled to compensation for the lost potential which he suffers as a result of his injury, and that he is not necessarily required to rehabilitate himself by finding a career compatible with his physical deficiencies. In the case of Anderson v. Welding Testing Laboratory, Inc., 304 So. 2d 351 (La.1974), the Supreme Court stated:
". . . the tortfeasor may be liable not only for monetary losses due to tortcaused disability, but also for general damages for a disability which prevents the injured victim from earning a living in the field of his experience and enjoyment or which otherwise limits the fields of opportunity or activity open to him." (Emphasis added)
The record reveals that the plaintiff is a man whose livelihood will depend upon his ability to perform skilled manual labor. Considering his age and mechanical inclination, I feel that the plaintiff's ability to develop and become proficient at his chosen skill had been severely diminished. For that reason I feel that even if the jury contemplated an award of $225,000 for lost future wages (and we do not know this) I would find this amount to be supported by the evidence, and thereby within the wide discretion which must be accorded *678 the trier of fact in these matters. I would thus leave such an award untouched.[3]
Being of the opinion that the award of $350,000 in this case is within the broad discretion of the trial court under the rules of Gaspard, Lomenick, etc., and Civil Code Article 1934(3) I would affirm the judgment of the District Court as to quantum.
For the above and foregoing reasons I respectfully dissent.

ON MOTION TO VACATE AND RECALL THE OPINION OF THIS COURT DATED MARCH 10, 1976
PER CURIAM.
Plaintiff moved to vacate and recall the opinion of this Court dated March 10, 1976 on the grounds that the opinion was rendered pursuant to an "en banc" hearing, requiring the affirmative vote of at least four of the six members of this Court. We deny the motion.
The facts are that on December 24, 1975, a panel of this Court consisting of Judges Culpepper, Domengeaux and Pavy unanimously affirmed the judgment of the trial court awarding plaintiff the sum of $350,000. On February 4, 1976, the original panel of three judges granted a rehearing, limited to a consideration of whether the quantum of the award should be reduced. On February 5, 1976, this Court issued an order that the rehearing be heard on February 19, 1976 before a panel of five judges in accordance with the provisions of La.Const.1974, Art. 5, Sec. 8(B).
On the date set, the rehearing was orally argued before a panel of five judges consisting of Judges Culpepper, Domengeaux, Pavy, Hood and Guidry. On March 10, 1976, the opinion in question was rendered reducing the award from $350,000 to the sum of $140,000. The opinion was signed by Judges Hood, Culpepper and Guidry. Judge Pavy concurred only to the extent of reducing the award to $200,000. Judge Domengeaux dissented.
Plaintiff argues that the rehearing was heard by the Court sitting en banc, and that under Dauzat v. Allstate Insurance Company, 257 La. 349, 242 So.2d 539 (1970), the opinion required the affirmative vote of a majority of the full membership of the Court. The Court of Appeal, Third Circuit consists of six judges. Plaintiff argues the opinion required the affirmative vote of at least four of the six judges.
We do not agree with plaintiff's basic premise that the rehearing in this case was heard by the Court sitting en banc. It was heard before a panel of five judges as required by La.Const.1974, Art. 5, Sec. 8(B), which states:
"A majority of the judges sitting in a case must concur to render judgment. However, when a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be reargued before a panel of at least five judges prior to rendition of judgment, and a majority must concur to render judgment."
Under the express provisions of the new constitutional provision quoted above, only a majority of the panel which hears the case on reargument must concur to render judgment.
The Dauzat case is not applicable, since it involves the situation where the court is sitting en banc. Here, the court was not sitting en banc.
MOTION DENIED.
NOTES
[1] This is the view of a majority of this panel but not of the writer nor of some regular members of the court not on this particular panel.
[1] Some of the cases following Gaspard and Lomenick are: Anderson v. Welding Testing Laboratory, 304 So.2d 351 (La.1974); Bitoun v. Landry, 302 So.2d 278 (La.1974); Walker v. Champion, 288 So.2d 44 (La. 1973); Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971).
[2] Another regular member of this court, not however on this panel, shares my view that the jury award should not be disturbed.
[3] A further analogy between Walker v. Champion, supra, and the case at hand lies in the fact that in both situations the plaintiff was earning more at the time of the trial than at the time of the injury.