Ronald HONEA, Plaintiff,

v.

MATSON NAVIGATION COMPANY,
a corporation, Defendant.

No. C–70–23 (OJC).

United States District Court,
N. D. California,
San Francisco Division.

Jan. 20, 1972.

Garrett P. Graham, San Francisco, Cal., for plaintiff.

Donald D. Connors, Jr., San Francisco, Cal., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, District Judge (Under Designation).

In this proceeding under the Jones Act, 46 U.S.C. § 688, Ronald Honea, employed as a room steward aboard the cruise ship, SS LURLINE, seeks damages for injuries received aboard the vessel on August 6, 1969, at approximately 11:00 a. m., while engaged in the performance of his duties when the cruise ship was docked at Honolulu, Hawaii, preparing for its return trip to San Francisco.

With candor, the defendant admitted at the trial and on brief that an unseaworthy condition existed. The sole questions presented to the court are (1) the contributory negligence, if any, of the plaintiff herein, and (2) the damages.

Honea's duties on the morning of the accident were to prepare the rooms for the passengers on the "A" deck. From about 8:00 to 10:00 a. m., he was engaged in stripping the beds in the staterooms. Approximately one hour before the accident Honea was setting up the staterooms for a "bon voyage" party to be held prior to the 4:00 p. m. sailing time. This latter duty required Honea to obtain ice, napkins, towels, placemats, glasses, mixers, flowers, fruit and champagne for the rooms.

A relatively narrow passageway led to the rooms in a forward and aft direction through the center of the vessel. The tile floor in the corridor was waxed and buffed three times each day, and gave off a high gloss when the lights were shining on same.

At the time of the accident Honea was walking in the passageway, carrying a paper bag filled with champagne, empty glasses and buckets without ice in his left hand, and linens and doilies in his right hand. He wore his usual working shoes which were crepe sole grippers. As he proceeded aft, past the pantry area, he suddenly slipped and fell in the corridor. Both feet went out from under him and he landed on his left hip. Honea states that he was looking where he was going but, because of the gloss reflecting off the highly waxed corridor, he did not see the puddle of ice and water which caused him to fall.

A standby for the steward's department, Peter K. Pahio, witnessed the accident. He was walking behind Honea in the same direction and, at the time, was observing Honea's wristwatch. Pahio could not tell what had caused Honea

to slip and fall until he went to assist the plaintiff, at which time he noticed an accumulation of ice and water which was approximately two feet in diameter. Honea was lying on his back in the water.

The ship's nurse was immediately called. Honea was numb from his waist down and could not move his legs. He was placed in a wheelchair and taken to the ship's hospital. The doctor was not aboard and Honea was promptly removed to the United States Public Health Service Clinic in Honolulu. A diagnosis revealed that Honea's left hip had been fractured. He was then transferred by ambulance to the Tripler Army Hospital where x-rays confirmed a linear fracture of the left femoral head. Surgery was performed the next morning; the operation consisting of a Deyerle procedure with a plate and pins being placed in the neck of the femur to stabilize the femoral head.

Defendant argues that since Honea and Pahio, by virtue of their duties, were repeatedly required to pass in the area of the accident, Honea did not exercise due care for his own safety. Moreover, defendant points to the fact that Pahio knew of the presence of the ice and water in the passageway and, for this reason, Honea, as a reasonably prudent man, should have likewise known of the puddle of ice and water.

■ ■ It is, of course, fundamental that the burden of establishing contributory negligence rests upon the defendant, unless such contributory negligence is shown by the plaintiff's own evidence or may be fairly inferred from all the facts and circumstances of the case. Equally clear is the established principle of law that a seaman does not assume the risk of an unseaworthy condition of the vessel.

■ In Pollard v. Seas Shipping Co., 146 F.2d 857 (2 Cir., 1945), where a defective condition of a catwalk and railing allegedly caused a seaman to fall overboard, the contention of the shipowner was that plaintiff's decedent was guilty of contributory negligence because other crew members had used the catwalk without incident or injury. The court brushed aside the argument that this established contributory negligence, citing Thunberg v. Panama R. Co., 139 F.2d 567, 569 (2 Cir., 1943). We hold that, under the facts here presented, there is no showing of contributory negligence merely because other seamen may have used the corridor, even if one or more seamen may have observed the puddle of ice and water.

■ Assuming arguendo that Honea learned of the presence of the ice and water prior to the accident, there is authority for the proposition that, in the absence of a showing that Honea knew of a safe alternative route, he would not be guilty of contributory negligence. In Smith v. United States, 336 F.2d 165 (4 Cir., 1964), the plaintiff slipped and fell from a bulkhead ladder which had inadequate toe clearance and hence insufficient recessed indentures. In reversing the trial court on the issue of contributory negligence, the court said:

"Further, the fact that 'the libelant knew of the condition of the recessed indentures' does not justify a finding of contributory negligence against him, for such a finding here is tantamount to holding that Smith assumed the risk of the defective ladder . . . Clearly, to say that Smith was at fault for using the ladder when he knew of its deficiency does not differ in substance from invoking the doctrine of assumption of risk against him.

"Had an alternative, safe route been available to Smith, his deliberate choice of a course known to be unsafe could possibly have indicated contributory fault, but mere knowledge of the unseaworthy condition and use of the ladder in the absence of a showing that there was an alternative is not contributory negligence."

■ While we have some doubts as to the vitality of *Smith* in all circuits, we think that, at most, knowledge of the existence of the unseaworthy condition would merely place upon the seaman a proportionately increased responsibility

in the exercise of due care under the circumstances. Clearly, in the present case, there was no alternative safe route other than to avoid the puddle of ice and water on the only available corridor. However, as previously noted, we do not find that Honea knew of the puddle in question; nor do we believe that he should have known of the condition merely because at least one other seaman was aware of same.

In Schell v. Chesapeake & Ohio Railway Company, 395 F.2d 676 (4 Cir., 1968), the district court was reversed in a situation where a machinist's helper had been sent aboard a tug to clean a platform made greasy by reason of the removal of a crank shaft. He slipped on the second step of a ladder located within a few feet of the greasy area. While the issue of contributory negligence was not squarely before the appellate court, the case was reversed and remanded for the assessment of damages, with the court stating:

> "Understandably, plaintiff did not see black on black when he inspected the ladder prior to ascending it or prior to descending it."

In applying an incorrect standard to contributory negligence in Ktistakis v. United Cross Navigation Corp., 316 F.2d 869 (2 Cir., 1963), the court reversed in part and held that contributory negligence cannot consist in the failure to meet an absolute standard of care, such as the duty to clean oil spill on the deck, but that, in determining whether plaintiff was guilty of contributory negligence, the traditional negligence standard of whether he exercised the care which a reasonably prudent man would have exercised under the circumstances would be applied.

■ Tested by the principles in *Ktistakis*,[1] we conclude that Honea exercised such reasonable care under the circumstances. He was not required to keep his eyes glued to the floor of the passageway and had the right to assume, in the absence of knowledge to the contrary, that the corridor would be reasonably fit for its intended use. We must, therefore, decline the invitation of the defendant to mitigate the damages for contributory negligence.

■ An examination of the Ninth Circuit cases, admittedly controlling, affords little comfort to the defendant. With the exception of Sines v. United States, 430 F.2d 644 (9 Cir., 1970), standing for the elementary principle that whether plaintiff's contributory negligence was a proximate cause of his injury and, if so, how much the award should be reduced, are factual questions not to be disturbed on appeal unless clearly erroneous, all other authorities cited by the defendant are district court rulings. We find the district court opinions inapposite.[2] Moreover, we must re-

1. *Ktistakis* was remanded for further consideration of the issue of contributory negligence. On remand, the trial court, applying the proper standard, reaffirmed its previous finding and, on appeal, the lower court was affirmed. 324 F.2d 728 (2 Cir., 1963), cert. den. 377 U.S. 915, 84 S.Ct. 1179, 12 L.Ed.2d 185. However, the factual situation involving oil dripping from the coupling for several hours, in a well-lighted area where the plaintiff was in direct charge of work being done, is a far cry from the mere presence of ice and water on the passageway of a cruise ship.

2. In McNeil v. Suan Shipping Co., 1970 A.M.C. 1835 (otherwise unreported) (N. D.Cal., 1970), plaintiff had been working on the docks for many years. He was injured when he fell over a piece of iron pipe which had apparently been dropped on the dock by the vessel's crane during the loading of scrap iron by a magnetic process. Plaintiff was a checker, employed for the purpose of approaching the gondola car to record the car number. Judge Weigel reduced the award by 75%, holding that plaintiff, by reason of his long experience as a dock worker, should have been aware of the existence of loose pieces of scrap iron. Manifestly, the inherent process of magnet loading involves, as Judge Weigel noted, an obvious spillage of scrap. That is not the situation in Honea's case.

In Scurry v. United States of America, 1965 A.M.C. 2756 (otherwise unreported) (N.D.Cal., 1965), the opinion is not given but, from the factual summary and briefs

member that Honea was carrying a substantial load in his left hand and it is impossible to tell, with any degree of certainty, to what extent this may have affected his vision as he walked along the passageway.

Turning to the question of damages, it is conceded that Honea was seriously and permanently injured. During the full year 1968, he earned as a seaman the sum of $2,917.69 and the additional sum of $2,528.69 in work other than as a seaman, primarily as a waiter in hotels and clubs.[3] The total for 1968 was $5,-446.38. In 1969, until the date of the accident, Honea's activities as a seaman realized only $258.10, and his other work brought in $485.90. However, it should be noted that, prior to joining the SS LURLINE, Honea underwent treatment at Mendocino State Hospital in California for reaction to drugs, during which time he was observed by psychiatrists. The record would not support a conclusion that drug reaction would be a disabling factor subsequent to the accident.

Honea's Social Security earnings record does not disclose any substantial income for years prior to 1968. In 1967, he earned $4,322.77; in 1966 the sum of $2,980.75; and in 1965 the sum of $2,-524.35. Plaintiff first started going to sea in 1968. Prior to that date he served as a waiter ashore at various hotels and clubs.

Plaintiff, in his brief, urges that $5,000.00 be used as a base for determining loss of earnings.[4] Defendant argues that the court should strike an average over 4½ years, thus resulting in $3,560.00 per annum. The working history of plaintiff does reveal a lack of regular employment, but apparently without difficulty in securing jobs. While we dislike accepting a figure between the two suggested by the parties, we think that a fair and reasonable per annum earning loss is $4,500.00, and it is upon this basis that we proceed.

Honea's initial treatment and first surgical procedure have been heretofore described. After approximately two months he was permitted to put weight on the leg. He walked on crutches for a while and in January 1970 he was declared fit for duty, according to his testimony, thus indicating a rather rapid period of rehabilitation. He signed aboard the PRESIDENT WILSON, operated by the American President Lines.[5] While he performed his duties with some degree of pain it did not disturb him too greatly as he anticipated pain. However, when the vessel reached Manila, the pain became intense and he was sent to a hospital where he remained for two or three weeks and was flown to the United States Public Health Service Hospital in San Francisco. At this latter hospital the seven Deyerle pins were removed on June 26, 1970. In the late summer of

of counsel, we assume that the plaintiff fell through a hatch board which was 3 inches short for the space designated by the vessel's color coding of hatch boards. The short hatch board had been placed into position by a fellow longshoreman. Judge Zirpoli held that plaintiff's own negligence in not seeing the short hatch board diminished his recovery by 20%. We do not know how obvious the short hatch board may have been and we consider the case inapposite.

3. The figures are taken from Social Security records. Obviously, if tips are considered, the total amount would be in excess of the amount stated. But if plaintiff elects only to report his wages, exclusive of tips, he should not be permitted to benefit by speculation as to the amount of his tips.

4. Plaintiff's brief urges a base wage of $5,000.00 for the year 1968. Actually the total earnings for 1968 amounted to $5,-446.38 which was, of course, the highest recorded year of Honea's earning capacity. It is not clear whether plaintiff's counsel was mistaken in his figures as to the true earnings for 1968, or whether he seeks to have the court accept $5,000.00 as an average loss of earnings per annum.

5. Plaintiff makes no claim for maintenance and cure. His past and future medical expenses are not before the court for consideration. His maintenance is apparently being paid. See footnote 6, infra, as to his period of service aboard the PRESIDENT WILSON.

1970, Honea was flown to his home in Hawaii where he underwent extensive physical therapy treatments. His condition improved for a month or two, but thereafter he deteriorated and, in the late fall, he was readmitted to Tripler Army Hospital where he remained for several months, following which he was returned to the hospital in San Francisco. On March 4, 1971, he underwent another surgical operation involving a bone graft from the tibia of the left leg to the injured femoral neck, same being known as the Bonfiglio operation. After a period of time, he was again returned to Hawaii. Honea has been essentially confined to bed or in a wheelchair since December 1970.

Honea is not a man without educational advantages. He completed two years of business administration at the University of Southern California after having graduated from Gulf Coast Military Academy in Biloxi, Mississippi. While in the United States Air Force, he attained the rank of technical sergeant where he performed duties as a statistician consolidating information reports coming in from various bases. After leaving the Air Force, he went with the Public Housing Administration in Washington doing statistical work but, within a few months, went to San Francisco in 1953. There he joined Local No. 30 and became a waiter and, for all practical purposes, continued thereafter as a waiter. In 1957 he obtained his seaman's papers but did not start shipping until 1968. His only earnings since the accident were from his services aboard the PRESIDENT WILSON in 1970 and, as per stipulation, he received $666.00 for this brief period which included his unearned wages for the balance of the voyage.[6] He has admittedly been otherwise continuously disabled since the accident on August 6, 1969.

The apparent cause of Honea's deteriorated condition was an impaired blood supply as a complication of the fractured hip. The medical diagnosis was vascular necrosis which, stated otherwise, means death of a piece of bone due to impaired blood supply.

The prognosis is guarded. Undeniably, Honea will develop posttraumatic arthritis of the left hip area. Another operation is required unless Honea elects to remain an invalid for the balance of his days. From July 26, 1971, when Dr. Lazar testified, no definite decision as to surgery could be made for nine months. During this waiting period, Honea should be nonweight-bearing. Approximately three months' care under a physical therapist, including periodic x-rays and examinations, would be required by a competent surgeon prior to operating. At the end of that period of time the election facing Honea is three-fold: (1) do nothing and remain an invalid; (2) permit the performance of an osteotomy which is the sectioning of the femoral neck and changing the articulation in the joint; and (3) permitting an intra-articular operation which involves the insertion of a cup for the purpose of smoothing the interior of the joint or, in the alternative, actually inserting substitute parts for the injured hip joint, stated otherwise, a prosthesis. At Honea's age, same being 45 years, it appears that alternative (2) above is favored if an operation is required, there being some indication of an improved blood supply.

Honea's earning capacity as a steward aboard a vessel has been seriously impaired. However, little significance can be attached to his loss. Cruise ships under the American flag have been priced out of business and, if Honea should endeavor to sail under a foreign flag, he would have far less wages than existed when he last worked aboard the LURLINE and PRESIDENT WILSON.

As to his ability to resume his duties as a waiter on shore, assuming a maxi-

6. There is some discrepancy as to exactly when Honea served aboard the PRESIDENT WILSON in 1970. Plaintiff testified that this service was in January and February. There is some intimation that it was in May. We deem it immaterial although we believe that the voyage commenced on May 6, 1970, and ended on June 12, 1970.

mum result, he may be able to work several hours each day but could not endure a full day's work. There will be some permanent limitation of motion in the hip area. Increased fatigue after a given period of time may be expected in any event. There are, of course, dangers associated with any future operation by reason of wound infection.

■ ■ Weighing all of the factors presented, we think that Honea's best prospects for the future lie in a desk job as a means to minimize his earning loss. And, frankly speaking, we see no reason why, after a period of rehabilitation following another operative procedure, he could not readily earn as much, and probably more, than he earned in 1968, his last and highest full year of work. A future loss of earnings is not controlled by a particular occupation such as a room steward or waiter. While Honea's preference may be along these lines, his prior experience and education point to a more successful endeavor in other fields. Allowing a reasonable period for rehabilitation, including time to secure suitable employment and advance training for same, we conclude that his earning loss should terminate at the expiration of four years from the date of the accident, or August 6, 1973. We therefore fix his past, present and future diminution of earnings at $18,000.00, less $666.00 received from the PRESIDENT WILSON during 1970, or a total loss of earning capacity in the sum of $17,334.00.

For Honea's pain, suffering, mental anguish, inconvenience and other discomforts, past, present and future, we award the sum of $75,000.00, thus making a total award of $92,334.00. While it may be true that Honea could possibly secure some sedentary work prior to August 6, 1973, we have not considered this factor as it is too speculative in view of the fact that Honea should elect to go forward with a further operative procedure at an undetermined future date and, additionally, this type of work for an invalid is very difficult to obtain.

A judgment order has been entered in accordance with this memorandum.