**Ricardo DIAZ, Plaintiff,**

v.

**UNITED STATES of America and Tidewater Maintenance Specialties, Inc., Defendants.**

Civ. A. No. 85–799–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 11, 1987.

Ralph Rabinowitz, Norfolk, Va., for plaintiff.

Richard K. Williard, Asst. Atty. Gen., Justin W. Williams, U.S. Atty., Raymond A. Jackson, Asst. U.S. Atty., Norfolk, Va., Benjamin L. Willey, Thomas W. Osborne, Trial Attys., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Senior District Judge.

The plaintiff seeks to recover damages for personal injuries sustained when he slipped and fell in a passageway while on board the U.S.S. DWIGHT D. EISENHOWER, CVN 69, (the EISENHOWER). The plaintiff brings this action under the Public Vessels Act, 46 U.S.C. §§ 781–790, and Admiralty Rule 9(h).

### Facts

The plaintiff retired from the U.S. Navy in November of 1981 as a master chief, mass management specialist (E–9) after 21 years of duty. Shortly thereafter the plaintiff opened Rick Diaz Restaurant Equipment and Supplies, a sole proprietorship.

On the morning of January 4, 1984, the plaintiff boarded the EISENHOWER, then docked in the Norfolk Naval Shipyard, Portsmouth, Virginia, to discuss the sale of restaurant equipment with Navy personnel. The plaintiff initially met with Lt. James B. Brinkman in the S–8 division office (a supply office), and then proceeded to the S–2 division office (the food service office), to meet with a Warrant Officer Vinas. Vinas then directed MS–3 Michael C. Cupp to escort the plaintiff to the supply storeroom

to obtain a list of items desired for purchase. The supply storeroom is one deck below and several compartments forward of the S–2 division office. En route to the supply storeroom, the plaintiff and Cupp had to pass through a passageway in which the entrance to the legal office was located.[1]

As the plaintiff and Cupp approached the entrance to the passageway, both noticed that work was being done to the deck at the far end of the passageway on the right (starboard) side. PN–3 John J. Lynch was stripping the wax from the deck of the passageway in preparation for an inspection. Ms. Deborah Williams Hurst,[2] an employee of Tidewater Maintenance Specialties, Inc. (Tidewater), was in the passageway instructing Lynch on the proper use of her company's wax stripper, "Excel–A–Rate." Tr. pp. 77, 96. Lynch had met Hurst when she boarded the EISENHOWER and escorted her to the passageway in which the entrance to the legal office was located. Hurst had noticed that Lynch was using the Navy issue stripper and informed him that the use of "Excel–A–Rate" offered an easier method of stripping the wax than the Navy issue stripper. Because Lynch had never used "Excel–A–Rate," Hurst instructed Lynch on the proper ratio of "Excel–A–Rate" to water and the proper amount of this mixture to put on the deck. Lynch testified that, at Hurst's direction, he put down more of the "Excel–A–Rate" mixture than he would have of the Navy issue stripper. Tr. p. 83. The left (port) side of the deck had already been stripped and was being kept open for use. Stripping one side of the passageway and then the other, so that one side would remain passable, was the method adopted by the Navy for simultaneously stripping high use passageways and keeping them open for use. The passageway was approximately four feet wide.

After about fifteen minutes of working on the deck on the starboard side, and some fifteen minutes before the accident, Lynch and Hurst noticed that the "Excel–A–Rate" mixture began to flow onto the port side. While continuing to agitate the "Excel–A–Rate" mixture on the starboard side, Lynch attempted to mop up the "rivulets" on the port side. Tr. p. 71. While Lynch and Hurst slipped but did not fall, both were standing in the stripper on the starboard side. It is not clear why the liquid ran onto the port side. There is testimony that the one degree list of the EISENHOWER on January 4, 1984, would not be sufficient to make liquid run on a ship that large; however, several witnesses attribute the rivulets on the port side to the listing of the vessel.

Plaintiff concedes that he and Cupp were warned, although there is some disagreement as to the words used by Lynch. Lynch stated, in effect, to the plaintiff and Cupp as they began down the passageway, "Watch your step, the deck is slippery." Cupp Dep. p. 7; Tr. p. 71. The plaintiff, following closely on Cupp's heels, noticed the work being done to the right of Cupp. The plaintiff and Cupp continued to talk back and forth about their business as they walked down the passageway. Cupp, leading the way, did not notice the "rivulets" on the port side prior to the accident. Approximately twenty feet into the passageway, the plaintiff slipped and fell, landing directly on his elbows. Tr. p. 23. The plaintiff did not see the "Excel–A–Rate" mixture on the port side until he saw it under him as he began to fall. *Id.*

As a result of the fall, the plaintiff suffered a small fracture of a bone spur in the right elbow. The bone spur pre-existed the accident. Additionally, the plaintiff has complained of pain in the left elbow and

---

1. There is some evidence which would suggest that an alternative route to the supply storeroom existed. Use of such a route would have required the plaintiff and Cupp to pass through certain sleeping quarters. It is not the practice of sailors assigned to the EISENHOWER to use sleeping quarters as a passageway, nor would it have been permitted for a civilian to enter this area under these circumstances. Therefore, for purposes before the Court, an acceptable alternative passageway to the supply storeroom was not available.

2. Deborah Williams Hurst was married on some date after the accident. She was known as Deborah Williams on the day of the accident.

right shoulder. The plaintiff first discussed the pain in his left elbow on March 23, 1984, on a follow-up appointment with his orthopedist, but did not mention the pain in his shoulder until August 6, 1984. The medical history suggests that the pain in the shoulder may be associated with the original injury, although there is no direct correlation to the fall on January 4, 1984. Meade Dep. p. 14. On February 5, 1985, the plaintiff was admitted for surgery. Both elbows were operated on and thickened bursa and bone fragments, in addition to the bone spurs, were removed from both elbows.[3] The plaintiff received some relief from the pain he complained of prior to the operation, but according to his testimony still suffers discomfort, sometimes extreme, especially when lifting heavy objects. The plaintiff is slightly restricted in his activity, letting pain dictate the activity in which he may engage, particularly with regard to lifting.

The plaintiff contends that the government was negligent in failing to take corrective action concerning an unreasonable risk of harm, despite the open and obvious nature of the danger under the standard set forth in *Scindia Steam Navigation Company, Ltd. v. DeLos Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). The plaintiff further complains that both defendants created the unsafe condition, had actual knowledge of the existence of the unsafe condition and the foreseeability of injury as a result thereof, and failed to give a warning sufficient to fulfill their duty of due care under the circumstances.

**Admiralty Jurisdiction as to Tidewater**

The Court's attention is initially directed to the question of whether admiralty jurisdiction is properly exercised in this instance. Tidewater questions whether the

harm the plaintiff complains of "bears a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 269, 93 S.Ct. 493, 505, 34 L.Ed.2d 454 (1972). In defining "traditional maritime activity," the Fourth Circuit expanded upon the *Executive Jet* decision in *Oman v. Johns-Manville Corporation,* 764 F.2d 224, 230 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 351, 88 L.Ed.2d 319 (1985), and suggested consideration of the following factors: "(1) the function and roles of the parties; (2) the types of vehicles and instrumentalities involved; (3) the causation and type of injury; and (4) traditional concepts of the role of admiralty law." Applying these four factors, the Court is convinced that Tidewater's involvement does not bear a significant relationship to traditional maritime activity, although the Public Vessels Act permits the application of admiralty concepts with respect to the United States of America.

First, the function and roles of the parties do not support admiralty jurisdiction. The plaintiff is involved in the restaurant equipment and supply business. Tidewater is in the maintenance equipment and supply business. Neither of these businesses are intimately intertwined with maritime activity. While each may chose to do business with enterprises connected with maritime activity, unless the business itself is particularly related to maritime matters or a vessel, the function and roles of the parties is no different from those which occur on dry land.[4] While sailors traditionally strip the deck on a regular basis, servicemen in all branches of the armed forces may be said to do the same. It would be difficult to conclude that the skills involved here evidence any talent solely within the knowl-

---

**3.** As to the pain in the left elbow, while there was no fractured bone spur in that elbow, there is sufficient evidence to support the argument that the pain was due to the trauma sustained on January 4, 1984.

**4.** The record does not disclose precisely what Tidewater or Diaz did, other than the fact that they were both engaged in soliciting orders for sales of their products to vessels. We assume that the two firms sold to anyone desirous of

purchasing whatever the firms had available for sale. No evidence was presented that either firm sold exclusively to vessels. It is true that Tidewater did not precisely specify in its pleadings that it would interpose the defense of contributory negligence as a complete bar to plaintiff's action, but a review of the pleadings and pretrial order clearly shows that Tidewater was relying upon contributory negligence as a defense.

edge of sailors. *See, Oman,* 764 F.2d at 230–31.

"The mere fact that the injury occurred on a boat, of course, does not dictate the application of admiralty." *Bubla v. Bradshaw,* 795 F.2d 349, 352 (4th Cir.1986). In this instance, the fact that the accident occurred on the ship is merely fortuitous. The accident is not predicated upon factors which possess a uniquely maritime character, but rather upon instrumentalities which would be exactly the same if the plaintiff had been walking down a hallway in any building on land.

The cause and type of injury does not support the application of admiralty jurisdiction. This cause arises from a classic slip and fall injury, in which the possible contributing factors bear no intimacy with maritime experience. The one degree list of the EISENHOWER on the day in question, which might have some relationship to maritime conditions, was eliminated as a contributing factor.

■ Last, there is no nexus between the traditional concept of the role of admiralty law and the resolution of this dispute. The Court is cognizant that "[t]hrough long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure." *Executive Jet,* 409 U.S. at 270, 93 S.Ct. at 505. However, while this cause might arguably touch upon the maintenance of the EISENHOWER, the underlying issue is not whether the EISENHOWER was adequately maintained. Rather, the focus here is whether Tidewater breached its duty of care to the plaintiff, given the exercise of control assumed by Tidewater's employee. The standard of care is the applicable standard owed a business invitee, and bears no relationship to the unique concerns of admiralty laws. Therefore, the Court declines to exercise its admiralty jurisdiction over the plaintiff's admiralty claim against Tidewater. Although the plaintiff has not plead in the alternative so that a pendent claim is before the Court based on a breach of the duty of care under Virginia law,[5] the Court hereby exercises its pendent jurisdiction, *sua sponte,* over any other claim the plaintiff may have against Tidewater.

### Admissibility of JAG Report

■ During the trial, Tidewater offered into evidence the report of the informal investigation into the accident compiled by the Navy officer charged to investigate the accident (the JAG report). The commanding officer of the EISENHOWER ordered Brinkman to conduct the investigation in accordance with Chapter VI of the Judge Advocate General's Manual. Tidewater offered the JAG report as an exception to the hearsay rule under F.R.E. 803(8)(C), 28 U.S.C. Reports setting forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness" are admissible as exceptions to the hearsay rule. F.R.E. 803(8)(C). Although the exhibit was tendered, the Court did not immediately review the report and reserved ruling on the admissibility pending submission of briefs. During the period the Court was considering the admissibility, the plaintiff agreed, without waiving any objections to admissibility, that the Court might review the report.

---

5. In an opinion referred to by the dissent as a "landmark opinion" and a "scholarly opinion," Chief Judge Henry Friendly discussed this issue, and others, in *Leather's Best, Inc. v. S.S. MOR-MACLYNX,* 451 F.2d 800 (2d Cir.1971). The Court clearly held "that a federal court has the power to hear a related state claim against a defendant not named in the federal claim regardless of whether the federal claim arises in the civil or admiralty jurisdiction." *Id.* at 811. In that case diversity did not exist and the Court held that, as to the state claim, the state law applied. Likewise, in footnote 10, page 809, the Court dealt with the issue raised in our footnote 4, *supra,* where the pleadings did not refer to pendent jurisdiction by saying: "Pendent jurisdiction is not matter which must be pleaded since the court already has jurisdiction over the case" (citations omitted). If the parties have any evidence which would contradict the assumption made in footnote 4, *supra,* this Court would entertain a motion to reopen the record, if such motion is promptly filed, limiting the same to the sales of products by Tidewater and Diaz.

Brinkman was appointed to conduct the investigation on January 6, 1984, two days after the accident. The investigation was primarily concerned with fact-finding. In ascertaining the relevant facts, Brinkman interviewed each of the witnesses and parties and then prepared a written statement, summarizing the interviews for each of the witnesses and parties to sign. Upon reviewing his written statement, the plaintiff refused to sign it because he believed that the statement was not accurate, particularly with regard to the sentence which stated that the plaintiff saw that the port side was wet before he proceeded down the passageway. Brinkman was unable to obtain the plaintiff's signature and was forced to paraphrase the plaintiff's statements into his findings of fact. Because of any animosity which might have arisen between the plaintiff and Brinkman, the plaintiff objects that the report is personally biased against the plaintiff, in addition to any bias which may have occurred because the report was prepared by an adverse party litigant.

The portion of the JAG report which set forth Brinkman's opinion was not offered as part of the report. Brinkman was present and testified about the compilation of the JAG report. Additionally, both Brinkman and the plaintiff were cross-examined concerning the plaintiff's refusal to sign the written statement.

The Court is thus faced with the question of whether "the sources of information or other circumstances indicate a lack of trustworthiness." The Court is guided by the discussion in *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 300–01 (4th Cir.1984), in which the court suggests that the reliability of a report be determined by: (1) the timeliness of the investigation; (2) the special skill or experience of the official; and (3) the possible motivational problems in preparing the report. Based on application of the facts herein to the *Ellis* standards, the Court is persuaded that the report is admissible.

The investigation was concluded within forty-five days of the accident, thereby insuring fresh recollection of the events. Second, although Brinkman did not have any particular legal or investigative skills, the scope of the informal investigation was sufficiently narrow so that special skill or experience was not essential. The Court recognizes that the report was not conducted by an individual with investigative skills.

The possibility of potential motivational problems is of particular concern here, given that the JAG report was compiled by a party litigant.[6] In *Ellis*, the court concluded that a study conducted on the causes of Toxic Shock Syndrome by the Center for Disease Control, (CDC), was admissible because the CDC would have "no conceivable motive for carrying out the studies in any other manner than to inform the public fairly and accurately." 745 F.2d at 301. While the motive in *Ellis* is not precisely the same as that behind the JAG report, the purpose is substantially analogous to refute any implication that the JAG report is biased, especially with respect to statements made by persons other than Diaz. JAG reports are routinely used for determination of damage to civilian and government property, assessment of the conduct of naval personnel and evaluation of existing procedures and operations. Additionally, JAG reports are used as a basis for settlement of claims under 10 U.S.C. §§ 7622–7623. The plaintiff asserts that because an intended purpose of JAG reports is the defense of claims for and against the government and among private parties, JAG reports are necessarily tainted because they are prepared with an eye towards litigation. The Court is not faced with the same problems of untrustworthiness expressed by the Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). Rather, JAG reports are routinely prepared as a candid recitation of the facts involved in a particular incident. Further, the JAG report herein does not present an account of the facts

---

6. The Court does not attach significance to the fact that Tidewater, and not the government, tendered the JAG report. The underlying question of whether the JAG report, which otherwise would be admissible under F.R.E. 803(8)(C), is trustworthy given the circumstances under which it was prepared.

substantially different from that offered by the plaintiff, except for the statement that the plaintiff saw the mixture on the port side before he proceeded down the passageway, which statement, if made, the Court disregards. The Court believes that the fact that the plaintiff's account and the JAG report differ to this extent goes to the weight of the evidence and not its admissibility.

Last, because the opinion and conclusion section was not offered, the Court is not presented with the question of whether the JAG report contains other than findings of fact. *See, Smith v. Ithaca Corp.*, 612 F.2d 215, 221–23 (5th Cir.1980).[7]

## Liability and Contributory Negligence

 Having thus decided the above preliminary matters, the issue of liability is now before the Court. The applicable standard of care is set forth in *Marin v. Myers*, 665 F.2d 57 (4th Cir.1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 163 (1982). The Court does not accept the plaintiff's urging that the applicable standard of care is that set forth in *Scindia* and *Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070 (4th Cir.1982). These cases state the standard applicable in cases which arise under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.

§§ 901–950, and are therefore inapposite. Under admiralty law, a boat owner owes a business invitee "a duty of reasonable care, but [is] not obligated to warn him of open and obvious dangers." *Id.*, 665 F.2d at 58. Similarly, Tidewater, under Virginia law, owed the same duty of care to the plaintiff. Although the plaintiff received a general warning that the deck was slippery, such a warning was not sufficient under the circumstances. With actual knowledge that the "Excel–A–Rate" mixture had run onto the port side, the defendants should have given the plaintiff a more adequate warning to that effect. Since both the plaintiff and Cupp were familiar with the stripping and waxing process, it was arguable for them to presume that the port side would be dry and safe for passage and reasonable to expect a warning to the contrary. The "rivulets" on the port side were not an open and obvious danger under these circumstances.

 Given that the plaintiff followed very closely on Cupp's heels and continued to talk back and forth with Cupp as he walked down the passage, the plaintiff failed to exercise reasonable caution for his own safety and such failure proximately contributed to his injury.[8]

7. In *Rainey v. Beech Aircraft Corp.*, 784 F.2d 1523 (11th Cir.1986), the Court reversed a judgment for the defendant because a JAG report contained an opinion that pilot error was the most probable cause of the crash. The Eleventh Circuit, bound by the Fifth Circuit decision in *Smith v. Ithaca Corp., supra*, held that it was error to admit this portion of the report. On a petition for rehearing *en banc*, the Eleventh Circuit granted same on May 27, 1986, 791 F.2d 833. As of March 10, 1987, the Eleventh Circuit has not acted. The preparer of the JAG report in *Rainey* was not called as a witness; in the present case the preparer, Brinkman, did testify. Moreover, this Court paid no attention to any opinion inferences in the JAG report prepared by Brinkman, if any such inferences do appear.

8. Plaintiff cites an opinion of the undersigned judge to support his claim of no contributory negligence. In *Honea v. Matson Navigation Company*, 336 F.Supp. 793 (N.D.Cal.1972), a seaman fell in a passageway of a passenger ship about to leave for a return trip from Honolulu to San Francisco. "Bon voyage" parties were the order of the day prior to the 4:00 p.m. sailing time. In response to a request for service the plaintiff was carrying a paper bag filled with champagne, empty glasses and buckets without ice in his left hand, and linens and doilies in his right hand. Plaintiff slipped and fell on a puddle of ice and water in the passageway. The defendant conceded the unseaworthiness of the vessel (a factor not involved with a business invitee), and the issue, aside from damages, was the contributory negligence of the plaintiff, if any. The tile floor of the passageway was waxed and buffed three times daily, and gave off a high gloss when the lights were shining on same. The *Honea* court held that plaintiff had the right to assume, *in the absence of knowledge to the contrary*, that the corridor would be reasonably fit for its intended use. In Diaz's case, he admittedly had "knowledge to the contrary," even though he may not have had knowledge as to the "rivulets" which had drifted over to the port-half of the passageway, probably because of an excess quantity of "Excel–A–Rate" being applied. The Court believes that it is an elementary principle of law that when a person is warned of a potential danger, such person must exercise reasonable care for his own safety *under all the facts and circumstances.* Stated otherwise, Diaz had a right to proceed forward into the area which was potential-

 The Court finds that the plaintiff was liable for one-third of his injuries. Under Virginia law, the plaintiff's contributory negligence is a complete bar to recovery against Tidewater. *Green v. Ruffin,* 141 Va. 628, 125 S.E. 742 (1924). Under admiralty law the rule of comparative negligence will reduce the plaintiff's recovery accordingly. *United States v. Reliable Transfer,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

## Damages

 The plaintiff's medical expenses aggregated $4,875.60 of which CHAMPUS has paid $3,640.71. Under *Mays v. United States,* 806 F.2d 976 (10th Cir.1986), and *Price v. United States,* 179 F.Supp. 309 (E.D.Va.1959), aff'd., 288 F.2d 448 (4th Cir. 1961), the government may deduct from its total liability payments made through CHAMPUS, because CHAMPUS payments are not from a source collateral to the United States. Therefore, the government remains liable for $1,234.89 in medical expenses. The plaintiff has not suffered any loss of future earning capacity which can be calculated with any reasonable degree of certainty; however, the plaintiff has demonstrated loss of wages which may be fixed at $149.10 for thirty-five and one-half days missed at a daily average of $4.20. The Court believes that this sum is properly calculated on the net profit from his business.[9] Last, the Court believes that the plaintiff has suffered both past and future pain and suffering in the amount of $20,000.00. The total recovery against the government is $14,286.00 ($21,383.99 less $7,127.99).

## The Cross-Claims

 The defendants, United States and Tidewater, have filed cross-claims for indemnity and/or contribution against each other.

Assuming *arguendo* that Tidewater was equally guilty of negligence which was a proximate cause of plaintiff's injuries, we are confronted with the interesting question as to whether the bar of contributory negligence which protects Tidewater's liability also bars the right of Tidewater's tort feasor in a claim by way of contribution.

---

ly dangerous but, in so doing, he could not assume that his walking was in complete safety and continue talking to Cupp without regard to the condition of the floor.

Plaintiff argues that he could not be found to be guilty of contributory negligence because no alternative safe route was available to him, relying upon *Smith v. United States,* 336 F.2d 165 (4th Cir.1964). What plaintiff overlooks is, however, the fact that he was a business invitee and not a seaman. The rule in *Smith* has been applied to seamen under the reasoning in *McCoy v. United States,* 689 F.2d 1196, 1198 (4th Cir.1982), holding: "We have consistently held that a seaman cannot be faulted for recognizing his job is dangerous and doing it anyway, unless he deliberately spurns a safe alternative provided him." The reasoning of *Smith* is grounded on the confusion between contributory negligence and assumption of risk, the latter not being a defense against the claim of a seaman. *Sessler v. Allied Towing Corp.,* 538 F.2d 630 (4th Cir.1976); *Chavis v. Finnlines, Ltd. O/Y,* 576 F.2d 1072, 1082–83 (4th Cir.1978); *Williams v. Stone Towing Line,* 430 F.2d 1266 (4th Cir.1970). We would never consider adopting the alternative route theory to a business invitee.

**9.** Diaz was drawing a Navy pension which is unaffected by his injury. His business began in July, 1982, and his gross sales for six months aggregated $11,336.48. In 1983 these gross sales increased to $70,549.20. In 1984, the year he was injured, his gross sales were $101,313.96. In 1985, his gross sales were $100,022.14. Of course, from his gross sales he was required to pay others from whom he obtained his products. His net business income revealed losses for 1982 (6 months) and 1983, in the amounts of $4,279.89 for 1982 and $1,184.59 for 1983. In 1984 and 1985, he showed gains of $967.10 and $1,558.42 respectively. While an injured party is entitled to future loss of earnings, the test is that the party should be placed in a pecuniary position equal to the position he would have held had the injury not occurred. *Standard Oil Co. v. Southern Pacific Co.,* 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925). Diaz has not, in the opinion of the Court, sustained any loss of earning capacity for the future. To make any arbitrary allowance for this item would be highly speculative.

As to the loss of earnings during 1984 and 1985 (35½ days), presumably the greater portion of time lost was in 1984, the year of his injury, although he was hospitalized for two days in February, 1985, when he underwent surgery. His average net income for these two years was $1,262.76. Computing this on the basis of 300 work days, as claimed by the plaintiff, this results in a daily average of $4.21, or a total loss of net income of $149.46.

Looking to Virginia law the Court must hold that the United States is not entitled to contribution against Tidewater because the plaintiff, Diaz, could not successfully maintain his action against Tidewater. *Laws v. Spain*, 312 F.Supp. 315 (E.D.Va. 1970); *Moretz v. General Electric Company*, 170 F.Supp. 698 (W.D.Va.1959), *aff'd in part, rev'd in part on other grounds*, 270 F.2d 780 (4th Cir.1959); *Pierce v. Martin*, 230 Va. 94, 334 S.E.2d 576 (1985); *Bartlett v. Roberts Recapping, Inc.*, 207 Va. 789, 794, 153 S.E.2d 193, 197 (1967); *Nationwide Mutual Insurance Co. v. Jewel Tea Co. Inc.*, 202 Va. 527, 532, 118 S.E.2d 646, 649 (1961); *Norfolk and Southern R.R. Co. v. Gretakis*, 162 Va. 597, 174 S.E. 841 (1934); *Massie v. Firmstone*, 134 Va. 450, 114 S.E. 652 (1922).

The same principle applies to claims of indemnity, *Drumgoole v. Virginia Electric & Power Co.*, 170 F.Supp. 824, 825 (E.D.Va. 1959), although there has been no suggestion of a contract between the United States and Tidewater in this case.

The claims of the defendants against each other, by way of contribution or indemnity, are DENIED.

**Conclusion**

A final judgment order reflecting these rulings is this day entered.